**Lyle R. GOETZ, individually and on behalf of all others similarly situated, Plaintiff,**

**Mark Cans and Anna Selletti, individually and on behalf of all others similarly situated, Intervenors,**

**v.**

**The Honorable Matthew CROSSON, in his official capacity of chief administrator of the courts of New York, and Dr. Richard C. Surles, in his official capacity of Commissioner of the New York State Office of Mental Health, Defendants.**

No. 88 Civ. 9134 (GLG).

United States District Court, S.D. New York.

July 30, 1991.

Mental Disability Law Clinic, Jacob D. Fuchsberg Law Center, Huntington, N.Y.

(William M. Brooks, of counsel), for plaintiff, Intervenors, and Class Members.

Robert Abrams, Atty. Gen. of State of N.Y., New York City (Yolanda M. Pizzaro, Thomas P. Dorsey, of counsel), for defendants.

## OPINION

GOETTEL, District Judge:

This case challenges the procedures employed by the State of New York for involuntarily committing psychiatric patients in Dutchess County. We will presume familiarity with our earlier decision granting motions for intervention and class certification, and dismissing plaintiffs' claim relating to the fifth amendment's privilege against self-incrimination. *See Goetz v. Crosson,* 728 F.Supp. 995 (S.D.N.Y.1990). Thus, only a brief recitation of the facts is required.

## I. FACTS

Under New York law, the state may involuntarily hospitalize an individual for up to sixty days upon the signature of two physicians. N.Y. Mental Hyg. Law § 9.27(a). Once such an individual is committed, he can demand a retention hearing to contest his confinement. N.Y. Mental Hyg. Law § 9.31(a). If the state satisfies the criteria for retention, the state can hold the patient for the longer of sixty days from the date of admission or thirty days from the order denying the application for release. N.Y. Mental Hyg. Law § 9.33(a).[1] Once this time has expired, further retention is not permitted unless the state applies for a further order of retention, at which time the patient is entitled to a hearing before a justice of the supreme court. *Id.* Moreover, even if the patient has not challenged his initial commitment, the state

must seek such an order if it wishes to detain him beyond the sixty-day period. N.Y. Mental Hyg. Law § 9.33(b). The patient can thereafter seek rehearing and review of any order of retention before a different justice of the same court. N.Y. Mental Hyg. Law § 9.35. At any of these hearings, the court may order the appointment of no more than two psychiatrists or psychologists to examine the patient and testify at the hearing. N.Y.Jud. Law § 35(4). The psychiatrists are hired at state expense with a cap of $300 if two are appointed and $200 if only one is appointed. The statute does, however, permit an application for greater fees in exceptional circumstances.

We previously certified as class plaintiffs involuntarily committed psychiatric patients located in Dutchess County. The two hospitals affected are Harlem Valley Psychiatric Center ("HVPC") and Hudson River Psychiatric Center ("HRPC"). Plaintiffs' complaint first seeks a declaration that the due process clause of the fourteenth amendment mandates that the state appoint an advocate psychiatrist to assist the patient and his counsel at retention hearings, much like the mandatory assignment of defense counsel in criminal matters upon a showing of financial need. Plaintiffs seek a further declaration that New York Judiciary Law section 35(4) fails to satisfy such constitutional dictates.[2] Defendants, in turn, suggest that the statute comports with any constitutional requirements that may exist. Plaintiffs now move for summary judgment. Defendants, while admitting that there are no genuine issues of material fact to be tried, do not bother to make a cross-motion for summary judgment. Nonetheless, it is well-settled that if the requisite showing is

---

1. The state must show by clear and convincing evidence that the patient "has a mental illness for which care and treatment as a patient in a hospital is essential to such person's welfare and whose judgment is so impaired that he is unable to understand the need for such care and treatment." N.Y. Mental Hyg. Law § 9.01; *see also In re Jeannette S.,* 157 A.D.2d 783, 550 N.Y.S.2d 383, 384 (2d Dep't 1990) ("hospital must establish, by clear and convincing evidence, that the patient is mentally ill and in need of further

care and treatment, and that the patient poses a substantial threat of physical harm to herself or others").

2. We previously dismissed plaintiffs' claim that the forced submission of involuntarily committed mental patients to a psychiatric examination violated the fifth amendment's privilege against self-incrimination. *Goetz,* 728 F.Supp. at 1003.

made, we can grant summary judgment to the non-moving defendants. *See Project Release v. Prevost,* 722 F.2d 960, 969 (2d Cir.1983).

At HVPC, once the patient contests his detention, a non-treating psychiatrist, Dr. Howard Smoller, who is nonetheless a HVPC employee, examines the patient. Smoller is not the psychiatrist involved in the daily treatment of the patients whom he examines. Smoller, unless he determines that the patient should be released, then testifies on behalf of the state at a retention hearing. The procedure at HRPC, however, is somewhat different. There, even if the patient contests confinement, the treating psychiatrist will testify at the retention hearing. However, defendants contend that while there is no employee with responsibilities analogous to those of Dr. Smoller, the treating physician's findings are nonetheless reviewed by at least one supervisory doctor. Plaintiffs challenge this purported supervisory involvement (through counsel's conclusory claims we might add), and while this creates a disputed issue of fact, it is not one which is material. Thus, it does not prevent the granting of summary judgment.

In Dutchess County, the overwhelming majority of retention hearings are held before either Justice Judith Hillary or Justice John King, Acting Justices of the Supreme Court of the State of New York, County of Dutchess. Generally, one presides at the initial hearing and, if necessary, the other will conduct the section 9.35 rehearing. As noted, they have the power to appoint up to two psychiatrists to examine the patient and testify at the hearing. Plaintiffs contend that while Justice Hillary usually appoints a psychiatrist if requested by the patient's counsel, Justice King does so only about half the time such a request is made, often demanding that counsel justify the making of such a request. The evidence establishes that in recent years, only Dr. Werner Cohn has accepted such appointments in Dutchess County. We are told, however, that quite recently a second psychiatrist, Dr. Paul Garson, has agreed to handle such matters. While hearings are held on a weekly basis, Cohn apparently is

available only one day each month and plaintiffs suggest that this creates unreasonable delays.

## II. DISCUSSION

Plaintiffs initially claim that there is a due process right to a psychiatrist who will be an advocate for the patient. Even if the psychiatrist ultimately cannot recommend that the patient be released, plaintiffs argue that the psychiatrist remains necessary to assist the patient's attorney with the case.

In support of this contention, plaintiffs assert that commitment proceedings are quasi-criminal and, hence, the same protections afforded criminal defendants regarding the appointment of psychiatrists must apply. There is no doubt that the Supreme Court has recognized an indigent *criminal* defendant's right to the appointment of a psychiatrist to assist the defendant and his counsel when the defendant's mental state is at issue. *Ake v. Oklahoma,* 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985) (court must appoint psychiatrist to "conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense"). The Court stated that when mental state is relevant to culpability and punishment, "the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense." *Id.* at 80, 105 S.Ct. at 1095. Nonetheless, since we find that commitment proceedings are not criminal, we are not bound by the Court's ruling.

■ In previously dismissing plaintiffs' contention that their fifth amendment rights were violated, we concluded that retention proceedings under New York's Mental Hygiene Law were civil in nature. *See Goetz,* 728 F.Supp. at 1003. We relied, *inter alia,* on a decision of the Appellate Division, Second Department, which recognized that while criminal proceedings seek punishment and deterrence, the goal of retention proceedings is the "care and treatment" of the individual. *See Ughetto v. Acrish,* 130 A.D.2d 12, 518 N.Y.S.2d 398, 403 (2d Dep't), *appeal dismissed,* 70

N.Y.2d 871, 518 N.E.2d 8, 523 N.Y.S.2d 497 (1987). In addition, it is clear that the expedited time periods established by New York's legislature attempt to insure that "committed persons may be released after the briefest time in confinement." *Allen v. Illinois,* 478 U.S. 364, 370, 106 S.Ct. 2988, 2992, 92 L.Ed.2d 296 (1986). Finally, while wrongful confinement must be avoided whenever possible, "the layer's of professional review and observation of the patient's condition, and the concern of family and friends generally will provide continuous opportunities for an erroneous commitment to be corrected." *Addington v. Texas,* 441 U.S. 418, 428–29, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323 (1979). The same cannot be said of an erroneously convicted criminal defendant. Therefore, we reaffirm our earlier conclusion that the proceedings at issue are civil in nature.

Plaintiffs contend that even if this is not a criminal or quasi-criminal proceeding, due process demands that patients be given access to a psychiatrist they can call their own. Furthermore, they claim that the current law in New York fails to satisfy these constitutional demands. Among the alleged deficiencies with section 35(4) of New York's Judiciary Law are the following: (1) it is discretionary whether or not to appoint the expert; (2) the expert is a court expert and does not assist the patients' counsel on medical matters; (3) Dr. Cohn is only available once a month, which leads to delays of three to six weeks from the time an expert is requested until a hearing is held; and (4) $200 is grossly inadequate to attract a sufficient number of psychiatrists.

It is uncontroverted that involuntary commitment constitutes a deprivation of liberty and implicates the fourteenth amendment's due process clause. *Addington,* 441 U.S. at 425, 99 S.Ct. at 1808–09. The issue, therefore, is determining the process to which plaintiffs are entitled. In resolving this question, the Supreme Court has announced a three prong test:

> The first is the private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.

*Ake,* 470 U.S. at 77, 105 S.Ct. at 1093.

Turning to the first prong, we admit that plaintiffs have a strong interest in not being retained if they do not require treatment. Besides the loss of one's liberty, there is an obvious stigma attached to confinement in a mental hospital. *Addington,* 441 U.S. at 425–26, 99 S.Ct. at 1808–10. Nonetheless, we reject plaintiffs' argument that this interest is the equivalent of a criminal defendant's, which the Supreme Court recognizes as "almost uniquely compelling." *Ake,* 470 U.S. at 78, 105 S.Ct. at 1093–94. It must be remembered that the commitment of a mental patient is for treatment, not punishment. Moreover, in retention proceedings the state is not seeking to "overcome the presumption of innocence," *Id.,* but rather, to protect society *and often the patient himself* from danger. *See Project Release v. Prevost,* 722 F.2d 960, 971 (2d Cir.1983) (state has interest "in providing care for those in need of treatment for mental illness and in maintaining order and preventing violence to self and others").

The second interest to be balanced is that of the state in opposing plaintiffs' proposal. In this regard, the state has important financial concerns that must be considered. It could become extremely expensive if the state were forced to hire a psychiatrist for a patient in every instance in which one is demanded. As it stands now, the presiding judge has the discretion to make such an appointment. Moreover, it is not as if merely hiring one psychiatrist will always suffice. Rather, if there is a patient psychiatrist and a state psychiatrist, the court may well utilize section 35(4) to hire a court psychiatrist to resolve the dispute. As to the hiring of these individuals, if, as plaintiffs suggest, the $200 fee is presently inadequate, it will remain inadequate. Thus, the state would be forced to raise its

reimbursement rates, which would obviously injure an already fragile state economy. We recognize, of course, that when liberty interests are at stake, the mere fear of financial harm to the state is insufficient to avoid constitutional dictates. Thus, we must turn to the third prong of the test.

The third factor to be considered contains two sub-parts, the first being the value of the additional safeguards and the second being the risk of an erroneous deprivation of rights if the proposal is not implemented. As to the first issue, there is no doubt that a judge relies heavily on the testimony of psychiatrists in such situations. He does so because he usually is dealing with an unbiased doctor who has no stake in the ultimate decision to release or retain the patient.[3] However, plaintiffs' proposal suggests that psychiatrists will be retained as advocates and this may limit the extent to which a judge may rely upon their testimony. There are also a number of other problems with plaintiffs' proposal, some of which have already been alluded to. Merely appointing a psychiatrist for the patient will not necessarily protect his rights. If, for example, the state's expert and the patient's expert proffer inconsistent opinions, the judge will likely seek a third expert, at state expense, to resolve the dispute. In addition, implementing plaintiffs' proposal may be rather difficult if, as plaintiffs suggest, the $200 fee is inadequate to attract psychiatrists. However, we are not persuaded by this argument since there is evidence establishing that even at this rate, counties within New York City have been able to attract more than one or two psychiatrists to act as court experts.[4] It may simply be that there are insufficient numbers of psychiatrists available in a small county like Dutchess to handle the alleged demand.

Besides the problems with attracting psychiatrists, there are substantive problems that exist concerning plaintiffs' proposal. First, the proposal may create ethical problems for appointed psychiatrists. If, for example, the doctor believes the patient should remain hospitalized, the question arises whether his allegiance belongs to his client, who would be better served by remaining hospitalized, or the attorney, who wants to "win" the case. It is important to recognize that a hospitalized mental patient is very often dangerous to *himself* as well as to the community. This situation is different from that where an attorney is appointed for a criminal defendant and must provide an adequate defense even if he believes his client is guilty. While both the attorney and the doctor have obligations to their respective clients, the criminal defense attorney's client obviously is better served if he is not incarcerated. Other concerns, however, are at issue with physicians since releasing a mentally ill patient may not necessarily be in the patient's best interests. As the Supreme Court has recognized, "[o]ne who is suffering from a debilitating mental illness and in need of treatment is neither wholly at liberty nor free from stigma." *Addington*, 441 U.S. at 429, 99 S.Ct. at 1811.

Another concern raised by plaintiffs is that currently the court appointed expert often ends up testifying against the patient, thereby creating a disincentive for patients to request the appointment. We do not see what else could be required since the entire purpose of such proceedings is to determine the truth. If Dr. Cohn conducts an examination, he should be permitted to testify as to his findings. This concern would not be alleviated by the new proposal. First, the patient's psychiatrist could possibly be called as a witness for the state. Moreover, even if evidentiary rules prevented this, *see, e.g.,* N.Y.Civ.Prac.L. & R. 3101(d)(2), an issue upon which we express no opinion, it seems clear that an inference would be drawn if the doctor

3. Of course, judges do not rely exclusively upon the opinions of experts for if the patient actually takes the stand, judges can make their own observations.

4. Defendants claim that these other counties, which have more psychiatrists available for section 35 appointments, experience similar delays to those occurring in Dutchess County. This may result, however, from a greater incidence of involuntary commitments in these other areas.

failed to testify. Plaintiffs seem to suggest that the doctor should conduct the examination, at state expense, but only testify if the patient likes what he is going to say. This seems to be an irrational approach in light of the purposes behind commitment proceedings. As to plaintiffs' need to call witnesses on their behalf, there is nothing preventing them from calling hospital employees, be they physicians or otherwise, to testify if they believe it would be helpful.

The next prong of the test is the risk of an erroneous deprivation of rights if the requested proposal is not implemented. In this regard, we must refer to the numerous protections afforded plaintiffs under New York law. In consonance with the Supreme Court's decision in *Addington v. Texas*, 441 U.S. 418, 427, 99 S.Ct. 1804, 1810, 60 L.Ed.2d 323 (1979), New York law requires a clear and convincing showing of both mental illness and a threat to oneself or others. *See supra* note 1. Moreover, the numerous levels of review available to patients more than adequately protect their rights. Before any involuntary commitment is permitted, two doctors must certify to such a need. Thereafter, there is the right to two hearings within a short period of time, before different judges, to contest retention.[5] Additionally, state judiciary law specifically permits the appointment of court experts and Justices King and Hillary regularly make such appointments. The fact that Justice King does not always honor such requests does not interfere with plaintiffs' rights. There is nothing impermissible about a judge exercising his discretion in not appointing a court expert when he does not believe it would be profitable.[6]

Finally, when looking at whether plaintiffs' rights may be erroneously deprived if they are not given their own psychiatrist,

we must look to the overriding purpose behind involuntary confinement. There is no concern with punishment or deterrence as exists in criminal cases and the state's goal is to permit functional, non-dangerous citizens to return to society as expeditiously as possible. Plaintiffs seem to ignore this fact. The care of the individual is of paramount concern.

For all the foregoing reasons, we find that the due process clause does not demand the appointment of a patient psychiatrist in retention hearings. Section 35(4) of the New York Judiciary Law affords plaintiffs all the protections to which they are entitled. Therefore, summary judgment for the defendants is granted and the clerk is directed to enter a judgment in their favor.

SO ORDERED.

---

5. In addition, HVPC employs a non-treating physician to examine the patient and testify at the hearing. Thus, an additional level of protection is afforded. While HRPC does not go this far, defendants contend that a supervisory physician verifies the treating physician's recommendation. As noted, plaintiffs do not necessarily recognize that such practices occur at HRPC. It is immaterial whether such review

occurs or not, however, because of all the other safeguards built into the system. HVPC's practices are admirable, but superfluous.

6. In fact, however, there is evidence that on at least a couple of occasions, Justice King appointed an expert when there had been no request made by the patient's counsel.