967 F.2d 29
 61 USLW 2010
 Lyle R. GOETZ, individually, and on behalf of all others
similarly situated, Plaintiff-Appellant,
Mark Cans and Anna Selletti, individually, and on behalf of
all others similarly situated, Intervenors-Appellants,
v.
The Honorable Matthew CROSSON, in his official capacity as
chief administrator of the courts of New York; and Dr.
Richard C. Surles, in his official capacity as Commissioner
of the New York State Office of Mental Health, Defendants-Appellees.
 No. 515, Docket 91-7761.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 15, 1991.
Decided June 10, 1992.
 
 William M. Brooks, Huntington, N.Y. (Mental Disability Law Clinic, Touro College, Huntington, N.Y., of counsel), for plaintiff-appellant and intervenors-appellants.
 Herbert Semmel, Ellen M. Saideman, Cary Lacheen, New York Lawyers for the Public Interest, Inc., New York City, of counsel, for amici curiae American Orthopsychiatric Ass'n, Disability Advocates, Inc., Disability Law Center of New York Lawyers for the Public Interest, Inc., Mental Health Ass'n in New York State, and Project Release.
 Dennis J. Saffran, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., New York City, of counsel), for defendants-appellees.
 Before VAN GRAAFEILAND, NEWMAN and WINTER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 This appeal concerns what sort of psychiatric assistance, if any, a state must provide to indigent individuals subject to involuntary commitment or retention proceedings. Judge Goettel held that New York's procedures governing such commitment or retention were constitutionally sufficient and entered summary judgment against the appellants. We agree with Judge Goettel that the Due Process Clause does not confer on involuntarily committed persons an absolute right to psychiatric assistance at commitment or retention proceedings. However, we cannot exclude the possibility that there are circumstances in which the participation of a psychiatrist unassociated with the state might be constitutionally mandated. Appellants have raised a number of issues of fact concerning the circumstances in which the appointment of such a psychiatrist might be required, and whether, as applied in Dutchess County, New York's procedures for appointing an independent psychiatrist are constitutionally sufficient. We therefore remand for further proceedings consistent with this opinion.
 
 BACKGROUND
 
 2
 Lyle Goetz has been an involuntary patient at the Harlem Valley Psychiatric Center in Dutchess County, New York, since March 21, 1987. In December 1988, Goetz brought the instant class action in the Southern District seeking declaratory relief on three claims, only two of which remain at issue. See Goetz v. Crosson, 728 F.Supp. 995, 1001-03 (S.D.N.Y.1990) (dismissing appellants' Fifth Amendment claim).
 
 
 3
 Goetz alleged that New York State fails to provide indigent patients subject to involuntary commitment with constitutionally-required psychiatric assistance. Such assistance is alleged to involve the provision of a psychiatrist to perform two tasks in every commitment or retention hearing: (i) the psychiatrist would testify on behalf of the patient at a commitment or retention hearing "if the psychiatrist believes [the patient's] clinical condition warrants such testimony"; and (ii) the psychiatrist would assist counsel in the preparation of the patient's case, whether or not he or she believed that commitment or retention was appropriate. For purposes of this opinion, we shall style this role as a "consulting psychiatrist." Goetz alleged that New York's failure to provide a consulting psychiatrist in all commitment and retention hearings violates the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. Goetz further alleged that New York's existing discretionary procedures for appointing a psychiatrist unassociated with the state to examine the patient and testify as to his or her condition at commitment or retention hearings, see N.Y.Jud.Law § 35(4) (McKinney Supp.1992), do not satisfy the requisites of due process. In this opinion, we shall style such a psychiatrist an "independent psychiatrist."[1]
 
 
 4
 Judge Goettel certified the class, Goetz, 728 F.Supp. at 1003-04, and granted motions to intervene by Mark Cans and Anna Selletti, two involuntary patients at the Harlem Valley Psychiatric Center with claims similar to those made by Goetz. Id. at 998. In August 1990, appellants moved for summary judgment. Judge Goettel denied this motion, and, notwithstanding the lack of a motion by the state defendants, granted summary judgment against the appellants dismissing their entire complaint, 769 F.Supp. 132. Stating that there were no material issues of fact in dispute, Judge Goettel held that the Due Process Clause did not require the appointment of a consulting psychiatrist. He did not address appellants' claims regarding the appointment of an independent psychiatrist in appropriate cases.
 
 DISCUSSION
 
 5
 A. New York State's Civil Commitment Procedures
 
 
 6
 We begin our analysis with a summary of New York law regarding involuntary civil commitment. There are two prerequisites to involuntary civil commitment, which, as a matter of federal constitutional law, must be proven by clear and convincing evidence. See generally Addington v. Texas, 441 U.S. 418, 431-33, 99 S.Ct. 1804, 1812-13, 60 L.Ed.2d 323 (1979) (due process requires at least clear and convincing proof at civil commitment proceedings). First, the subject of the commitment proceedings must be mentally ill and "in need of involuntary care and treatment." N.Y. Mental Hyg. Law § 9.27(a) (McKinney 1988). A person is "in need of involuntary care and treatment" if he or she "has a mental illness for which care and treatment as a patient in a hospital is essential to such person's welfare and [his or her] judgment is so impaired that he [or she] is unable to understand the need for such care and treatment." N.Y. Mental Hyg. Law § 9.01. Second, the subject must "pose[ ] a substantial threat of physical harm" to him or herself or to others. In re Jeannette S., 157 A.D.2d 783, 550 N.Y.S.2d 383, 384 (1990); see also O'Connor v. Donaldson, 422 U.S. 563, 575-76, 95 S.Ct. 2486, 2493-94, 45 L.Ed.2d 396 (1975) ("A finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement.... [A] State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends.").
 
 
 7
 A subject of a commitment proceeding may be committed to a mental health institution upon the application of a relative or other qualified person and the certification of two examining physicians. Prior to admission, a third physician who is a member of the psychiatric staff of the institution must examine the individual and confirm the need for involuntary care and treatment. N.Y. Mental Hyg. Law § 9.27(e). Alternatively, in cases where a need for immediate in-patient treatment exists and where there is a substantial risk of physical harm to the patient or others because of the patient's mental illness, a director of community services may make an application for involuntary commitment. The subject of such an application may be admitted if a staff physician confirms the need for immediate hospitalization. Within seventy-two hours of admission, a second examining physician must certify that involuntary treatment is appropriate. N.Y. Mental Hyg. Law § 9.37(a). There are also procedures for emergency admission. N.Y. Mental Hyg. Law § 9.39.
 
 
 8
 No matter what the particular path leading to involuntary commitment, the involuntarily committed patient thereafter becomes the beneficiary of a rather elaborate procedural scheme for notice, hearing, review, and judicial approval of continued retention in a mental health facility. See N.Y. Mental Hyg. Law §§ 9.29-9.35, 9.37(a), 9.39(b). The period of retention without court approval is limited to sixty days.[2] N.Y. Mental Hyg. Law § 9.33(a). At any time during this period the patient may request a hearing on the need for continued commitment. A hearing must be held within five days of such a request after which the court may grant or deny the patient's application for release. N.Y. Mental Hyg. Law § 9.31.
 
 
 9
 The institution must release the involuntarily committed patient within either thirty days of the denial of an application for release or sixty days after the initial commitment, whichever is later. N.Y. Mental Hyg. Law § 9.33(a). If the staff of the facility believes that the patient needs further institutionalization, they have the burden of obtaining court authorization to retain the involuntary patient. Id. The patient may request a hearing to determine whether the court should issue a retention order. The failure to make such a request within five days of receiving written notice of an application for retention may result in the entry of an order of retention without a hearing. Id. Such a retention order is effective for six months. N.Y. Mental Hyg. Law § 9.33(b). At the end of six months, the staff of the facility, following the same procedures, may obtain a retention order effective for up to an additional year. N.Y. Mental Hyg. Law § 9.33(d). Subsequently issued retention orders are effective for up to a maximum of two years. Id.
 
 
 10
 Within thirty days of the issuance of any retention order, the involuntarily committed patient may request a rehearing and review of the order by a judge other than the one who signed the original order. At this stage the patient has the right to a jury trial. N.Y. Mental Hyg. Law § 9.35.
 
 
 11
 A patient has the right to counsel during all of these proceedings, including counsel paid by the state where the patient cannot afford one, N.Y.Jud.Law § 35(1)(a). In addition, during any retention hearing, the court may appoint up to two independent psychiatrists to examine the patient and testify at the particular hearing. N.J.Jud.Law § 35(4) (McKinney Supp.1992). A psychiatrist so appointed may be paid up to $200. If two independent psychiatrists are appointed, their combined compensation is limited to $300. However, the court may, in "extraordinary circumstances" approve compensation in excess of these limits. Id.
 
 
 12
 We upheld New York's involuntary civil commitment procedures when they were challenged as facially unconstitutional in Project Release v. Prevost, 722 F.2d 960 (2d Cir.1983). Appellants, however, raise slightly different issues. They argue that, in addition to New York's existing procedures, due process requires that the state appoint a consulting psychiatrist, as defined supra. They also argue that, facially and as applied in Duchess County, New York, Section 35(4) of the New York Judiciary Law fails to satisfy what they identify as a patient's more limited right to the testimony of an independent psychiatrist.
 
 B. The Right to a Consulting Psychiatrist
 
 13
 In reviewing a grant of summary judgment, we examine the record de novo, and view the evidence in the light most favorable to the party opposing summary judgment. See, e.g., Dube v. State University of New York, 900 F.2d 587, 597 (2d Cir.1990).
 
 
 14
 We first examine whether the Due Process Clause requires New York State to provide an indigent involuntary patient with the services of a consulting psychiatrist. The Supreme Court has held that a state must provide an indigent criminal defendant with the assistance of a psychiatrist when the defendant places at issue his sanity at the time of the offense. Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985). Appellants analogize the patient subject to involuntary commitment to the criminal defendant because each has a liberty interest in the outcome of the relevant proceedings. Because of this parallel interest, appellants insist that the patient subject to involuntary commitment, like the criminal defendant who pleads insanity, has a right to the assistance of a consulting psychiatrist. However, while Ake is relevant, it does not control our decision in light of other Supreme Court precedent clearly indicating that constitutional protections granted criminal defendants are not automatically extended to civil commitment proceedings. Cf. Addington, 441 U.S. at 428, 99 S.Ct. at 1810-11 ("a civil commitment proceeding can in no sense be equated to a criminal prosecution").[3]
 
 
 15
 Because significant liberty interests are at stake, involuntary civil commitment proceedings must satisfy due process, Vitek v. Jones, 445 U.S. 480, 491-92, 100 S.Ct. 1254, 1262-63, 63 L.Ed.2d 552 (1980); Addington, 441 U.S. at 425, 99 S.Ct. at 1808-09, as guided by three factors: (i) the interests of the individual subject to involuntary commitment; (ii) the governmental interest affected by the provision of additional safeguards; and (iii) the risk of erroneous deprivation of the individual's interests without additional safeguards, and the probable value, if any, of such additional safeguards. Ake, 470 U.S. at 77, 105 S.Ct. at 1093; Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).
 
 
 16
 Erroneous commitments, of course, implicate the individual's interest in liberty. See, e.g., Addington, 441 U.S. at 425, 99 S.Ct. at 1808-09. Appellants emphasize this interest and identify additional ways in which an erroneous commitment may cause harm, including the stigma of being labelled mentally ill by the state, the potential financial loss to the patient, who, if able, must pay part of the cost of treatment while committed, and the possibility of psychological harm to the patient resulting from the commitment. However, erroneous non-commitments or releases also implicate other interests of the individual that must be considered in due process analysis. There is thus an interest in receiving treatment for one's mental illness. There is also an interest in avoiding situations in which the individual harms him or herself. Finally, the individual benefits from not harming, or threatening to harm, third parties, actions that might lead to criminal incarceration or injury to the individual through responsive acts of self-defense by the third parties.
 
 
 17
 The governmental interest is primarily financial. According to the state defendants, providing every indigent involuntary patient with a consulting psychiatrist would entail large expenditures. Appellants dispute this claim and suggest that providing indigent patients with a consulting psychiatrist may in fact save state money by reducing the number of persons involuntarily committed. Although the state's assessment of fiscal consequences is far more certain than that of appellants, a closer scrutiny of those consequences is unnecessary because of the third element of due process analysis.
 
 
 18
 This element compels us to evaluate the probable value of a consulting psychiatrist and the risk of error if such assistance is not provided. Relevant to this inquiry are the safeguards and procedures that currently exist to protect against erroneous commitment. Also relevant are the unique nature of civil commitment proceedings and the dual goals of involuntary commitment--to provide care and treatment to those unable to care for themselves and to protect the individual and society from those who pose a danger to themselves and others because of mental illness. See Addington, 441 U.S. at 426, 99 S.Ct. at 1809-10.
 
 
 19
 We conclude that the due process clause does not require a state to provide an indigent patient with a consulting psychiatrist in every commitment or retention proceeding. Such a psychiatrist would perform two functions: (i) providing testimony favorable to non-commitment or release if the psychiatrist's professional judgment so warrants; and (ii) providing assistance to counsel in preparing the patient's case even where the doctor favors commitment or retention. These functions are not of sufficient import to implicate due process in every proceeding.
 
 
 20
 We examine first the need for testimony by a consulting psychiatrist. Presently, a psychiatrist testifies at commitment or retention hearings on behalf of New York State and opines as to why the patient needs involuntary treatment. If the hearing judge believes additional expert testimony is warranted, an independent psychiatrist may examine the patient and testify at the hearing. N.Y.Jud.Law § 35(4) (McKinney Supp.1992). The patient's attorney has an opportunity to cross-examine these experts, as well as any other adverse witnesses. If a consulting psychiatrist were to testify, his or her testimony would, by definition, favor release and thus would to some degree contradict the conclusions of the state's witnesses.
 
 
 21
 Psychiatrists often disagree about the proper diagnosis and treatment of particular patients, see Addington, 441 U.S. at 429-30, 99 S.Ct. at 1811-12, and we can assume that psychiatrists may also be unable to predict future dangerousness with great certainty, see Barefoot v. Estelle, 463 U.S. 880, 900 n. 7, 103 S.Ct. 3383, 3398 n. 7, 77 L.Ed.2d 1090 (1983). We may also assume that some psychiatrists tend to favor institutionalization more often than others who tend to favor release. However, we have no basis for assuming that psychiatrists associated with the state have a bias toward institutionalization.
 
 
 22
 Given these assumptions, we may conclude that the provision of a consulting psychiatrist in every commitment or retention proceeding will increase the number of instances in which conflicting psychiatric testimony is given. We may also conclude that the increase in conflicting psychiatric testimony may to some indeterminant degree decrease the number of commitments and retentions. However, a decrease in the number of commitments or retentions is not the same as a decrease in the number of erroneous adjudications, which is the focus of due process analysis. The consulting psychiatrist will not always be right and the state psychiatrist always wrong, or vice-versa.
 
 
 23
 In the ordinary adversary system, we tolerate and sometimes require a "battle of the experts" because it is thought to increase the accuracy of a trial's outcome. See, e.g., Ake, 470 U.S. at 81, 105 S.Ct. at 1095 (In a criminal prosecution where defendant's insanity is at issue, competing testimony of psychiatrists enables jury "to make its most accurate determination of the truth on the issue before them."). The logic underlying the "battle of the experts" in criminal proceedings does not hold in the context of civil commitment proceedings, however. Unlike civil or criminal proceedings, the interests of the parties to a civil commitment proceeding are not entirely adverse. The state's concerns are to provide care to those whose mental disorders render them unable to care for themselves and to protect both the community and the individuals themselves from dangerous manifestations of their mental illness. Addington, 441 U.S. at 426, 99 S.Ct. at 1809-10. A major component of the state policy is thus the protection of mentally ill individuals, as recognized by New York's provision of multiple and repetitive opportunities for involuntary patients to obtain release. And finally, "[i]t cannot be said ... that it is much better for a mentally ill person to 'go free' than for a mentally normal person to be committed." Addington, 441 U.S. at 429, 99 S.Ct. at 1811.
 
 
 24
 The goals of due process in these circumstances are thus to provide procedures that protect against erroneous non-commitments and releases as well as against erroneous confinements. Although the testimony of a consulting psychiatrist may be assumed to move adjudicators toward the latter goal, it must also be assumed to move adjudicators away from the former goal. However, the goals may not be of equal weight. Erroneous confinements may cause greater harm than erroneous non-commitments or releases, and, while the testimony of consulting psychiatrists may not alter the number of erroneous adjudications, we can speculate that it will reduce the most harmful errors.
 
 
 25
 However, the consulting psychiatrist's function of providing favorable testimony overlaps with the function performed by independent psychiatrists, at least when the independent psychiatrist favors non-commitment or release. Indeed, a court-appointed psychiatrist, whether designated as independent or consulting, is likely to be the same person. The only difference, therefore, is that a consulting psychiatrist would not testify if he or she favored commitment, whereas an independent psychiatrist would. But appellants do not claim that they are entitled either to a consulting psychiatrist who favors non-commitment or release or to exclude adverse psychiatric testimony. Appointment of a consulting psychiatrist will not, therefore, provide favorable testimony beyond that available from a court-appointed independent psychiatrist. Appellants' right to a testifying psychiatrist, therefore, is fulfilled so long as constitutionally adequate procedures exist for the appointment of an independent psychiatrist.
 
 
 26
 We turn now to appellants' claim that the Due Process Clause requires the appointment of a consulting psychiatrist even when such a doctor cannot as a professional matter give testimony favorable to the patient's release. The responsibilities of the consulting psychiatrist would include, for example, suggesting strategies for cross-examining the state psychiatrist even though the consulting psychiatrist also believes that commitment is essential.
 
 
 27
 We do not believe the Due Process Clause always imposes such a requirement. The function of assistance to counsel is not one that we believe to be so significant that it is required in all cases. In some cases, evidence of dangerousness and mental illness other than the testimony of the state psychiatrist may be decisive. In other cases, we are confident that counsel will be able to gain a sufficient level of expertise as to psychiatric matters to meet due process requirements. The need for litigators to become learned in other fields is not uncommon today, and we see no basis for compelling the state to provide a consulting psychiatrist in every commitment or retention proceeding. However, we acknowledge that there may be a limited number of cases in which counsel can show by affidavit a compelling fact-specific need for a consulting psychiatrist to educate counsel in particular aspects of a case. We limit the role to education in the complexities of psychiatric diagnosis because we believe that providing assistance in trial strategy might pose a dilemma for a psychiatrist whose professional judgment favored commitment. Such assistance might well entail the pressing of arguments believed by the psychiatrist to be irrelevant, specious, or misleading. In any event, no such affidavit has been filed with regard to any plaintiff in the instant matter, and we therefore leave further consideration of such a limited right to future cases.
 
 C. The Right to an Independent Psychiatrist
 
 28
 The allegations of appellants' complaint suggest a second, related claim. Some proceedings may present a need for independent psychiatric testimony in addition to that offered by the state to ensure an accurate decision. As a practical matter such proceedings are limited to cases in which the presiding judge determines that the record leaves unexplored or unanswered questions and that additional psychiatric testimony is necessary. In such cases, the individual's interests in both freedom and self-protection are directly affected, and the failure to provide such testimony may implicate due process concerns. Appellants' second claim, therefore, concerns the adequacy of New York's procedures for the appointment of an independent psychiatrist.
 
 
 29
 Section 35(4) of the New York Judiciary Law permits a judge conducting a commitment hearing to appoint an independent psychiatrist to examine the patient and testify as to the patient's condition. N.J.Jud.Law § 35(4) (1992). In their complaint, appellants allege numerous deficiencies in the way Section 35(4) has been applied in Dutchess County. These include allegations that: (i) independent psychiatrists are infrequently used; (ii) only one psychiatrist is available to act as a court-appointed expert in Dutchess County, causing long delays in commitment hearings; and (iii) limitations on the compensation to be paid to court-appointed psychiatrists for their testimony reduces the number of psychiatrists willing to accept such appointments. Based on these allegations, appellants ask for, inter alia, a declaration that Section 35(4)'s application in Dutchess County "fails to satisfy the requirements of independent psychiatrist [sic] assistance that the Fourteenth Amendment to the United States Constitution imposes."
 
 
 30
 This claim was never addressed by Judge Goettel because of the procedural posture of the case when he granted summary judgment against appellants. At that time, the only motion for summary judgment had been made by appellants themselves, and their papers addressed only their broadest claim, namely a right in every commitment or retention proceeding to a consulting psychiatrist. While it might have been harmless to use appellants' motion as the vehicle for dismissing what is a facial claim on a record that needed no amplification as to that claim, appellants' motion did not provide a record suited to dismissal of their second, fact-based claim.
 
 
 31
 We cannot exclude the possibility that this narrower claim may have merit. Where the trier believes that an accurate assessment of the subject's psychiatric condition cannot be reliably made without the aid of an independent psychiatrist, and the subject is financially unable to procure such testimony, a cognizable due process concern may arise. The liberty and self-protection interests of the subject are at stake, the fiscal consequences to the state are far more attenuated than in the case of a claim to a consulting or independent psychiatrist in every commitment or retention proceeding, and the danger of an inaccurate ruling is established by the trier's judgment that independent psychiatric testimony is necessary. Of course, because of the non-adversary nature of such a proceeding, the independent psychiatric testimony may favor commitment or retention, the reason, perhaps, that appellants' counsel has not emphasized the narrower claim.
 
 
 32
 Whether New York's procedures sometimes do not provide access to the testimony of an independent psychiatrist when the presiding judge believes such testimony to be necessary cannot be determined on the record before us. We therefore remand for further proceedings on this claim.
 
 CONCLUSION
 
 33
 In sum, the Due Process Clause does not grant an indigent individual subject to involuntary commitment an absolute right to the assistance of a consulting psychiatrist. Such a right might arise in a case in which counsel has shown a compelling fact-specific need for the assistance of a psychiatrist to educate counsel in particular aspects of a case. No such showing has been made with regard to any plaintiff in the instant matter. Nor is there an absolute right to the assistance of an independent psychiatrist. However, where the presiding judge determines that such testimony is necessary to a reliable assessment of a patient, an indigent individual should have the right to obtain the testimony of an independent psychiatrist. The facts are not sufficiently developed for us to determine whether New York affords such a right, and we thus remand to the district court to determine whether New York's procedure for appointing a psychiatrist, as applied in Dutchess County, satisfies constitutional standards.
 
 
 34
 VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:
 
 
 35
 Section 35(4) of New York's Judiciary Law provides that when a court orders a hearing to determine whether a person should be committed to or retained in a State mental institution, it "may appoint no more than two psychiatrists, certified psychologists or physicians to examine and testify at the hearing upon the condition of such person." This codifies the historically-recognized, inherent power of a court to appoint disinterested expert witnesses to aid it in determining scientific issues. See Scott v. Spanjer Bros., Inc., 298 F.2d 928, 930 (2d Cir.1962). Crucial to the effective use of this practice is the requirement that the experts so appointed be independent and disinterested. See People ex rel. Sweeting v. Johnston, 26 A.D.2d 685, 272 N.Y.S.2d 437 (1966) (mem.); People ex rel. Butler v. McNeill, 30 Misc.2d 722, 728, 219 N.Y.S.2d 722 (Sup.Ct.1961). "A court-appointed medical expert who expresses his professional opinion in a trial is not a partisan, but is, in effect, the court's witness." Massey v. The District Court, 180 Colo. 359, 365, 506 P.2d 128 (1973). In the absence proof to the contrary, we may assume that no State judge will appoint experts who are not disinterested and independent. We are encouraged in this assumption by our recognition of the duty that the State imposes upon the Mental Hygiene Legal Service to assist the court in obtaining section 35 expert opinion and to see that all requirements of law as to patients' admissions, treatment and discharge which affect patients' rights have been complied with. See N.Y.Mental Hyg.Law §§ 47.01, 47.03; McKinney's 1992 New York Rules of Court §§ 694.2, 694.4; Ughetto v. Acrish, 130 A.D.2d 12, 21-22, 518 N.Y.S.2d 398, appeal dismissed mem., 70 N.Y.2d 871, 523 N.Y.S.2d 497, 518 N.E.2d 8 (1987). Indeed, in view of the hospital's legal duty and medical purpose to subject mentally disturbed persons to the least restrictive and shortest institutionalized treatment possible, see 14 NYCRR Part 36, Section 36.1, it ordinarily may be assumed that hospital officials themselves are not biased in favor of a different methodology. See United States v. LaFromboise, 836 F.2d 1149, 1152 (8th Cir.1988); Williams v. Wallis, 734 F.2d 1434, 1438 (11th Cir.1984); cf. Youngberg v. Romeo, 457 U.S. 307, 323, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982); Society for Good Will to Retarded Children, Inc. v. Cuomo, 737 F.2d 1239, 1248 (2d Cir.1984).
 
 
 36
 Appellants insist, however, that the proceeding by which the need for hospital care is determined must be treated as an adversary one. They demand the right to obtain at State expense the services of an expert whose report will not be available for review by State officials and whose testimony, if given, will be contradictory to that of the medical experts employed by the State or appointed by the court. This, I suggest, misconceives the role of a patient's attorney, which should be to see that the client gets such care and treatment as the client needs, not to treat the State as an adversary to be fought tooth and nail whenever the client's liberty is threatened. I have no doubt that, if sufficient funds are made available to a patient's lawyer, the lawyer will be able to find an "expert" to testify that the patient does not require hospitalization. "Experience has shown that an 'expert' can be found to support almost any position if one searches long enough and pays well enough." LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir.1984). That kind of expert testimony might fit quite comfortably into a murder trial. It seems out of place in a civil competency hearing where the "modern concept of handling cases of mental illness is treatment, not simply incarceration," and the objective of both the state and the patient is to return the patient to society as soon as "it is likely to be safe for others and helpful to the patient." St. George v. State, 283 A.D. 245, 248, 127 N.Y.S.2d 147, aff'd, 308 N.Y. 681, 124 N.E.2d 320 (1954).
 
 
 37
 For the foregoing reasons and others capably expressed in Judge Winter's opinion, I agree with Judge Winter that no patient has an absolute right to the State-financed assistance of either a testifying or consulting expert. I am troubled, however, by my colleague's decision to make the State judge's finding of a "need" for such assistance into a constitutional requirement that the State must provide it. The State has the burden of proving by clear and convincing evidence the necessity of institutionalization. Matter of Harry M., 96 A.D.2d 201, 208, 468 N.Y.S.2d 359 (1983). If the testimony of attending physicians and section 35 medical experts does not satisfy the State court that this burden has been met, there is no need for the State to underwrite the hiring of an interested witness to testify to that effect.
 
 
 38
 The State's plan provides for the appointment of up to two independent, disinterested psychiatrists and limits the amount that they can be paid. As I understand the plan proposed by my colleagues, it calls into question not only the appointment of a third expert, who is interested, but also the amount of his remuneration, and perforce the remuneration of the section 35 experts, which presently has a $200-$300 cap. In addition, the district court, upon remand, will have to take into account the alleged shortage of independent psychiatrists in Duchess County, the likely duration of such shortage, and its effect on the $200-$300 statutory cap. A federal court is ill-equipped to determine what adjustments, if any, should be made, and is ill-advised to force such adjustments on the State of New York as being mandated by the United States Constitution.
 
 
 39
 I either would deny appellants all relief, without prejudice to relief being sought in the State courts, or would abstain from any decision in the matter pending a resolution in the State courts of the issues raised herein. See Reetz v. Bozanich, 397 U.S. 82, 85-86, 90 S.Ct. 788, 789-90, 25 L.Ed.2d 68 (1970); Harrison v. N.A.A.C.P., 360 U.S. 167, 176-77, 79 S.Ct. 1025, 1209-31, 3 L.Ed.2d 1152 (1959); Logan v. Arafeh, 346 F.Supp. 1265, 1271-72 (D.Conn.1972) (three-judge court), aff'd mem., 411 U.S. 911, 93 S.Ct. 1556, 36 L.Ed.2d 304 (1973).
 
 JON O. NEWMAN, Circuit Judge, concurring:
 
 40
 I concur in Judge Winter's opinion and add these few words only to point out the hazard of reading too much into the quotation from the Supreme Court's opinion in Addington v. Texas, 441 U.S. 418, 429, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323 (1979), concerning the relative consequences of releasing a mentally ill person and committing a mentally normal person.
 
 
 41
 Initially, we should bear in mind precisely what the Supreme Court said and the context in which it was said. Chief Justice Burger's opinion began the pertinent discussion by pointing out that "it is not true that the release of a genuinely mentally ill person is no worse for the individual than the failure to convict the guilty." Id. This was so, he continued, because "[o]ne who is suffering from a debilitating mental illness and in need of treatment is neither wholly at liberty nor free of stigma." Id. (citations omitted). That set the stage for the sentence Judge Winter quotes:
 
 
 42
 It cannot be said, therefore, that it is much better for a mentally ill person to "go free" than for a mentally normal person to be committed.
 
 
 43
 Id.
 
 
 44
 The quoted sentence must not be understood to mean that committing a mentally normal person is no worse a consequence than releasing a mentally ill person. That is not what the sentence says. At most, it denies that it is "much better" to release a mentally ill person than to commit a mentally normal person. But the sentence surely does not deny that it remains better to release a mentally ill person than to commit a mentally normal person. And that is how the balance of consequences must be struck. It is true that releasing a mentally ill person has adverse consequences for that person. The person forgoes, or at least postpones the receipt of, needed treatment. But it cannot be that such consequences are equal to the consequences of committing a mentally normal person.
 
 
 45
 The wrongful deprivation of liberty under any circumstances is among the most grievous harms that society can inflict. Wrongful confinement in a mental hospital is a horrendous consequence. In addition, no matter how much care is exercised in the diagnosis of mental illness, it is inevitable that large numbers of mentally ill persons will not be diagnosed and will remain at liberty. A civilized society must therefore acknowledge that, if mistakes are to be made, it is better to add one more mentally ill person to the population at liberty than to place within the asylum one person who is mentally normal.
 
 
 46
 The quoted sentence from Addington was written to contrast the relative risks of error that will be tolerated in the mental illness context from those that will be tolerated in the context of criminal conviction. See id. at 428-29, 99 S.Ct. at 1810-11. We usually say that it is better that some number of guilty persons go free than that one innocent person be imprisoned, though we might not all agree on the number of wrongful acquittals we are willing to accept to guard against one wrongful conviction. One familiar version is that it is better that ten guilty persons go free than that one innocent person is convicted, see 4 William Blackstone, Commentaries ch. 27, p. 358, a formula sometimes recounted in our criminal jurisprudence, see, e.g., Furman v. Georgia, 408 U.S. 238, 367 n. 158, 92 S.Ct. 2726, 2792 n. 158, 33 L.Ed.2d 346 (1972) (Marshall, J., concurring) (quoting William O. Douglas, Foreword in Jerome Frank and Barbara Frank, Not Guilty 11-12 (1957)); Bunnell v. Sullivan, 947 F.2d 341, 352 (9th Cir.1991) (in banc) (Kozinski, J., concurring); United States v. Greer, 538 F.2d 437, 441 (D.C.Cir.1976)[1]. However one might set the ratio in the criminal context, it is surely arguable that some lesser ratio should apply in the mental illness context. If ten to one is appropriate in the criminal context, then perhaps one could plausibly say that it is better that five or perhaps three mentally ill persons be released than that one mentally sound person be confined. The lower ratio reflects both the harmful consequence to the person if a mentally ill person is erroneously released and the continuing review of confinement that occurs in the mental health context but not in the criminal context. Whatever ratio one prefers in the mental illness context, my point is that we cannot reasonably say that releasing one mentally ill person is equal to confining one mentally sound person. Some ratio greater than one to one must be used.
 
 
 47
 Whatever ratio one selects, procedural protections must be fashioned to give some reasonable assurance that the pattern of erroneous releases and erroneous confinements will approximate the ratio that one finds tolerable. And in setting the ratio and formulating the appropriate procedural protections to achieve it, we would do well to consider the matter from behind John Rawls's veil of ignorance: we should select a pattern we would find tolerable not knowing whether we would be one of those erroneously released or one of those erroneously confined. See John Rawls, A Theory of Justice ch. 24 (1971).
 
 
 48
 These considerations ought to bear heavily on the implementation of the flexible due process standard that Judge Winter's opinion sensibly leaves for case-by-case development. The decision whether to afford the committed person the assistance of a consultant psychiatrist must be made in light of the fact that it is indeed better (even if not "much" better) to release a mentally ill person than to confine a mentally normal person. Of course, the appointment of a consultant psychiatrist does not necessarily mean that there will be an ultimate decision to release, much less a decision to release a mentally ill person. All it means is that the adversary process will function on a more informed basis, leaving to the state court judge the final ruling as to whether confinement should be continued or ended.
 
 
 
 [1]
 By independent psychiatrist, we mean a psychiatrist unassociated with the state, who will examine the patient and testify as to the need for institutionalization. Such a psychiatrist will testify at commitment or retention hearings regardless of whether the testimony supports or rejects commitment or retention. Such a psychiatrist also has no obligation to provide any other assistance to the patient or the patient's counsel
 
 
 [2]
 Those initially admitted on an emergency basis may be confined for an additional fifteen days. N.Y.Mental Hyg.Law § 9.39(b)
 
 
 [3]
 Even the criminal defendant who wishes to plead insanity does not have an automatic right to the assistance of a psychiatrist. Instead, the criminal defendant must make a threshold showing that his sanity will be a "significant factor" at his trial before the right to a psychiatrist attaches. Ake, 470 U.S. at 82-83, 105 S.Ct. at 1095-96. This issue does not arise in commitment or retention proceedings because the state has by definition put the subject's mental illness in issue
 
 
 [1]
 More generous ratios have been expressed. See, e.g., Sir John Fortescue, De Laudibus Legum Angliae, ch. 27, p. 65 (originally written 1471, republished in Dr. Chrimes ed., Cambridge Univ. Press 1949) ("I should, indeed, prefer twenty guilty men to escape death through mercy, than one innocent to be condemned unjustly); Thomas Starkie, Evidence 756 (1824), quoted in IX Wigmore on Evidence § 2497 at 409-10 (Chadbourn rev. 1981) ("The maxim of the law is that it is better that ninety-nine ... offenders shall escape than that one innocent man be condemned."). Many respected jurists have simply remarked that "it is far worse to convict an innocent man than to let a guilty man go free." See, e.g., In re Winship, 397 U.S. 358, 372, 90 S.Ct. 1068, 1076-77, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)