72 F.3d 1051
 Florangel RODRIGUEZ, Plaintiff-Appellant,
v.
The CITY OF NEW YORK, The New York City Health and Hospitals
Corporation, Eileen Sweeney, M.D., personally, and
Douglas Lee, M.D., personally,
Defendants-Appellees.
 No. 140, Docket 95-7009.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 8, 1995.
Decided Dec. 19, 1995.
 
 William M. Brooks, Huntington, New York (Michael Bergman and John Hui, law student interns, Mental Disability Law Clinic, Touro College, Jacob D. Fuchsberg Law Center, Huntington, New York, on the brief), for Plaintiff-Appellant.
 Mordecai Newman, New York City (Paul A. Crotty, Corporation Counsel of the City of New York, Larry A. Sonnenshein, New York City, on the brief), for Defendants-Appellees.
 Before: FEINBERG, KEARSE, and LEVAL, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiff Florangel Rodriguez appeals from a judgment entered in the United States District Court for the Southern District of New York pursuant to Fed.R.Civ.P. 54(b), Kimba Wood, Judge, (1) dismissing her claims pursuant to 42 U.S.C. Sec. 1983 (1988) against defendants Eileen Sweeney, M.D., Douglas Lee, M.D., New York City Health and Hospitals Corporation ("HHC"), and the City of New York ("City") for, inter alia, causing Rodriguez's involuntary commitment to Bellevue Hospital Center ("Bellevue" or the "Hospital") in violation of her rights under the Due Process Clause of the Constitution and New York Mental Hygiene Law ("MHL") Sec. 9.39 (McKinney 1988 & Supp.1994), and (2) dismissing her claim for a declaratory judgment that she is not liable for charges assessed against her by HHC for care and treatment during her involuntary confinement. The district court granted summary judgment in favor of defendants on the ground that the acts of Drs. Sweeney and Lee in committing Rodriguez satisfied the requirements of MHL Sec. 9.39 and due process as a matter of law. The court further ruled that since the commitment did not violate Rodriguez's rights, she is liable to HHC for the cost of her care and treatment during that commitment. On appeal, Rodriguez contends principally that summary judgment was improper because there were genuine issues to be tried as to the generally accepted standards in the medical community with respect to circumstances permitting involuntary emergency commitment, and as to the reasonableness of defendants' decision to commit her. For the reasons that follow, we agree, and we vacate the judgment and remand for trial.
 
 I. BACKGROUND
 
 2
 Some of the facts are not in dispute, though there are disputes as to the significance of those facts, whether viewed in isolation or viewed in the context of other facts that are disputed.
 
 
 3
 A. The Undisputed Facts as to Rodriguez's Involuntary Commitment
 
 
 4
 On May 25, 1991, Rodriguez went to Bellevue, a City hospital operated by HHC, seeking to obtain free sleeping pills. Informed that she could not obtain such medication without speaking to a physician, Rodriguez was then examined by Dr. Sweeney, a second-year resident in the Bellevue psychiatric emergency room with the responsibilities of a physician. Rodriguez cried during the interview and informed Sweeney that she had recently had trouble sleeping and eating at home; that she was sad because she was in a difficult period; that the past year, during which her marriage had been annulled, had not been a happy time for her; that she was experiencing a stressful relationship with her roommate; that her family in Venezuela was not as supportive as she would have liked; that her job performance had declined; and that a brother and a sister had previously taken overdoses of sleeping pills.
 
 
 5
 Dr. Sweeney concluded that Rodriguez should be committed to the Hospital on an emergency basis pursuant to MHL Sec. 9.39. That section provides in essence, to the extent pertinent here, that an individual "alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate," may be admitted to a hospital involuntarily on an emergency basis if a hospital staff physician, upon examination of the individual, finds that the mental illness "is likely to result in serious harm" to the individual or others. MHL Sec. 9.39(a). "Likelihood to result in serious harm" is defined to include a
 
 
 6
 substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself.
 
 
 7
 Id. Rodriguez was held at the Hospital despite her protests.
 
 
 8
 On May 26, Rodriguez was examined by Dr. Lee, a psychiatrist on duty in the Bellevue psychiatric emergency room. Dr. Lee had read Dr. Sweeney's notes and concurred with her conclusion. Rodriguez remained confined involuntarily and was treated at the Hospital until May 28, when she was examined by another doctor and released. Following her release, HHC sent her a bill for services rendered during her confinement.
 
 
 9
 Rodriguez commenced the present action in 1993, principally alleging that her involuntary commitment at Bellevue violated her rights to substantive and procedural due process (first, second, and fifth causes of action) and requesting compensatory and punitive damages, as well as an order directing the expungement of her hospital record. She also sought a declaratory judgment that she is not liable for the charges billed to her by HHC (seventh cause of action).
 
 
 10
 B. Defendants' Version of the Information Given to Drs. Sweeney and Lee
 
 
 11
 Following a period of discovery, defendants moved for summary judgment dismissing, inter alia, Rodriguez's first, second, and fifth causes of action, contending that the undisputed facts established as a matter of law that defendants had complied with the requirements of MHL Sec. 9.39 and thereby satisfied the demands of substantive and procedural due process. In support of their motion, defendants proffered their version of the information given to Drs. Sweeney and Lee, citing the defendant doctors' deposition testimony and the hospital record containing the notes they made of their interviews of Rodriguez.
 
 
 12
 Dr. Sweeney stated that she examined Rodriguez on May 25 for about an hour and twenty minutes. The hospital record of her notes on the interview attribute various statements to Rodriguez, including that Rodriguez had been feeling depressed since August 1990 when her marriage was annulled; that Rodriguez's job performance was poor because of her impaired concentration, and her coworkers had noticed this; that she had not been able to eat or sleep for the past two weeks; that Rodriguez said " 'nothing makes me happy' "; that Rodriguez "admit[ted] to + [i.e., positive] suicidal ideation" and said she would not care if a car hit her while she was crossing the street; and that Rodriguez said she wished she would die. According to the notes, Rodriguez also said she had seen a psychiatrist several times in Venezuela approximately a decade earlier because she was depressed, and that her brother and two sisters had "made suicide attempts/gestures by OD'ing [i.e., overdosing] on pills." Dr. Sweeney's notes described Rodriguez's mood as depressed and anxious, and they stated that Rodriguez was very tearful and sobbed loudly throughout most of the interview.
 
 
 13
 The notes also indicated that Dr. Sweeney had received input by telephone from Rodriguez's roommate, Rosario Medina. According to the notes, Medina told Dr. Sweeney that since Rodriguez moved in with her some five weeks earlier, Rodriguez had not slept at all during the night, had spent a lot of time in the bathroom at night, had had daily crying episodes, did not do any household chores, and never wanted to go out. Medina also stated that Rodriguez had told Medina she thought God had sent her to Medina because He thought Medina could help her.
 
 
 14
 The hospital record indicates that Dr. Sweeney concluded that Rodriguez had "[n]o clear suicidal plan at present," but that "Patient is very depressed, unable to care for herself and expressing positive suicidal ideation/intent.... She is a potential danger to herself and would benefit from hospitalization."
 
 
 15
 Dr. Lee too, having reviewed Dr. Sweeney's notes, concluded that Rodriguez had suicidal ideation. His notes indicated that Rodriguez confirmed to him that on the previous day she had told Dr. Sweeney she "did not care whether a car hit her while crossing the street" and that on that day she wanted to be hit by a car.
 
 
 16
 C. Rodriguez's Version of Her Statements to Drs. Sweeney and Lee
 
 
 17
 The accuracy of the contents of the notes taken by Drs. Sweeney and Lee was sharply disputed by Rodriguez. In opposition to defendants' summary judgment motion, Rodriguez submitted an affidavit conceding that though the defendant doctors had made the notes found in the hospital record, those notes in many respects inaccurately or incompletely depicted the statements made by Rodriguez. She also submitted the affidavit of psychiatrist Peter Stastny, M.D., who concluded that the performance of Drs. Sweeney and Lee failed to meet the generally accepted standards of the medical community. Rodriguez cross-moved for summary judgment in her favor on certain claims.
 
 
 18
 According to her own affidavit, Rodriguez had gone to the Hospital on May 25 not because she was depressed but because she had had trouble sleeping and Medina had told her that at the Hospital she could obtain sleeping pills free of charge. Rodriguez stated that in the interview, though she informed Dr. Sweeney that she had been "sad" because of a difficult period that included a marriage annulment, she had never thought of herself as depressed. Rodriguez stated that she never told Dr. Sweeney that she was depressed, never told Sweeney that nothing made her happy, never said she would not care if a car hit her, and never said she wished she would die.
 
 
 19
 Nor did Rodriguez tell Dr. Sweeney that she had consulted a psychiatrist a decade earlier because of depression; rather, she had consulted the psychiatrist because she was about to leave Venezuela to attend college in the United States and she was anxious about leaving home on her own. Rodriguez stated that she had begun to cry during the interview with Dr. Sweeney only because Dr. Sweeney questioned her about painful topics such as her annulment and because it began to appear to her that Dr. Sweeney meant to hospitalize her involuntarily, and Rodriguez had feared for her well-being.
 
 
 20
 Rodriguez stated that she did not tell Sweeney that she had been unable to eat or sleep for two weeks; rather, she had stated that for a week she had been having trouble sleeping and eating at home, and that these difficulties were directly related to unreasonable behavior by her roommate, Medina, which included Medina's shouting at Rodriguez for inconsequential matters and insisting that whenever Rodriguez prepared a meal Rodriguez must wash the cooking utensils before eating her meal. Rodriguez stated that her eating difficulty occurred only at home; she had no difficulty in eating elsewhere. She also told Dr. Sweeney that she had never lost interest in either daily activities or leaving the house, and that she did perform household chores. She had discontinued late-night socializing with Medina only because she had a new job that required her to rise early in the morning.
 
 
 21
 Rodriguez also stated that Dr. Sweeney's description of Rodriguez's family took Rodriguez's statements out of context. As to overdoses of sleeping pills, Rodriguez stated that she had told Dr. Sweeney that two of her siblings, not three, had taken such pills, and Rodriguez had explained in some detail that her brother's overdose was accidental and that her sister's was an attempt to manipulate her parents and that neither act was an attempt at or gesture of suicide. And though she had stated that one member of her family appeared more interested in items that she brought to Venezuela from the United States than in Rodriguez herself, she had told Dr. Sweeney that she believed her mother and one of her sisters were supportive and that her family was understandably unable to provide greater emotional support for her because, inter alia, one was suffering from debilitating allergies and another had just been diagnosed with cancer.
 
 
 22
 Rodriguez stated that Dr. Sweeney did not ask her whether she had told "Medina that ... God had sent me to Ms. Medina because God thought she could help me. I never made such a statement and if I was questioned by Dr. Sweeney, I would have explained that I never uttered such words." According to Rodriguez, the interview by Dr. Sweeney lasted not an hour and twenty minutes but only twenty minutes; and Sweeney had read questions from a preprinted form in rapid-fire fashion and "appeared not to want to listen" to what Rodriguez was saying.
 
 
 23
 Rodriguez took similar issue with the evaluation made by Dr. Lee, who she said had interviewed her for just 10 minutes. Rodriguez stated that though Dr. Lee may have made certain notes, they did not accurately reflect Rodriguez's statements. For example, she denied that she told Lee either that she had wanted to be hit by a car or that she had made such a statement to Dr. Sweeney.
 
 
 24
 Dr. Stastny stated in his affidavit dated July 29, 1993 ("First Stastny Aff."), that he had clinically examined Rodriguez and had read, inter alia, her affidavit, her Hospital record, and the depositions of Drs. Sweeney and Lee. Dr. Stastny stated that, taking Rodriguez's statements as true, both the clinical conclusions of Drs. Sweeney and Lee and the method by which they reached their conclusions violated minimum clinical standards of psychiatry.
 
 
 25
 Characterizing Dr. Sweeney's performance as marred by "glaring errors" (e.g., First Stastny Aff. p 16), Dr. Stastny stated that a 20-minute interview of a previously unknown patient is simply insufficient to permit a determination as to whether the patient is suicidal or otherwise poses a danger to herself or others. He also stated that it was error for Dr. Sweeney to ignore the context in which Rodriguez placed her own descriptions of such matters as her eating, sleeping, and work experiences, her relationships with her family, and her own history. Further, noting Dr. Sweeney's apparent reliance on statements made by Medina, such as the statement that Rodriguez had said God sent her to Medina, Dr. Stastny concluded that
 
 
 26
 Dr. Sweeney's failure to attempt to determine whether or not the plaintiff made such a statement constituted another glaring error since the physician believed that such a statement was evidence of psychosis.... [I]t was incumbent on Dr. Sweeney to determine whether or not the plaintiff had made the statements that she believed amounted to evidence of psychosis.
 
 
 27
 16. One of Dr. Sweeney's more glaring errors consisted of failing to determine whether or not Ms. Rodriguez stated that she did not care if a car hit and she wished she would die. The unreasonableness in not attempting to corroborate this information can be evidenced by a reading of Dr. Sweeney's conclusions contained within the plaintiff's hospital record. The physician believed that the plaintiff posed a danger to herself because of suicidal ideation and intent but the purported statement that she wished she would die and she did not care if a car hit her were the statements that Dr. Sweeney interpreted as manifestations of suicidal intent and ideation.
 
 
 28
 (First Stastny Aff. pp 15, 16.)
 
 
 29
 Dr. Stastny noted that Rodriguez had no prior history of depression or other mental illness or suicidal behavior, that she had demonstrated her ability to cope well with stress, and that she had numerous individuals who were willing to provide support and immediate care through any crisis. Dr. Stastny also concluded that Dr. Lee had acted unreasonably in finding Rodriguez a danger to herself, because Dr. Lee, like Dr. Sweeney, had unreasonably ignored certain statements and failed to seek corroboration for others. Dr. Stastny concluded that even the out-of-context and uncorroborated statements credited by the defendant physicians were an insufficient basis on which to reach a reasonable conclusion that Rodriguez posed a danger to herself and required immediate hospitalization.
 
 
 30
 D. The Evidentiary Hearing and the Decision of the District Court
 
 
 31
 The district court, stating that the interpretation of MHL Sec. 9.39 was critical to the resolution of the parties' summary judgment motions, convened an evidentiary hearing pursuant to Fed.R.Civ.P. 43(e) to determine the generally accepted meaning within the medical community of Sec. 9.39's use of the terms "threat[ ] ... of suicide" and "conduct demonstrating [that a person] is dangerous to himself." At the hearing, Dr. Stastny testified that "conduct" demonstrating that a person is a danger to herself is considered to include only certain types of overt, physical acts. He defined "suicidal ideation" as the term psychiatrists use to denote a person's thinking about suicide. Ideation thus includes thoughts that do not constitute intent, and ideation is not conduct. He testified that symptoms are not necessarily conduct and that the symptoms noted by the defendant doctors in this matter were not conduct. Dr. Stastny testified that "conduct" that demonstrates that a person poses a danger to herself, as psychiatrists understand that term, is "complex motor behavior that puts that person directly at risk of harming herself." (Hearing Transcript, September 9, 1993, ("Tr."), 18-19.)
 
 
 32
 In contrast, defendant's expert, Dr. Michael Allen, Director of the Comprehensive Psychiatric Emergency Program at Bellevue, testified that MHL Sec. 9.39 is interpreted more broadly, that "conduct" includes mental and emotional behavior, and that vague ideation can sometimes be an appropriate basis for involuntary admission under Sec. 9.39. Dr. Allen stated that the important factors in assessing the risk of a patient's harming herself are presence of a mental illness, suicidal ideation, social stressors or factors, performance on a mental status examination, past psychiatric history, and family history or demographics; and he suggested that "conduct" could be considered anything that, in light of these factors, a person would be "capable of doing":
 
 
 33
 Q. To what extent may these factors that you have described be considered other conduct demonstrating that a patient is dangerous to him or herself?
 
 
 34
 A. Well, I really disagree with Dr. Stastny's narrow definition of conduct. And I think most psychiatrists would. There is a school of thought in fact that would suggest that anything that people are capable of doing is in fact conduct.
 
 
 35
 Behavior and conduct I think would be used interchangeably by most psychiatrists and most psychiatrists would feel comfortable speaking of mental behavior, emotional behavior, and in that framework I think much of what I described would be considered conduct or behavior.
 
 
 36
 (Tr. 128-29.)
 
 
 37
 After the close of the hearing, the court found the experts' testimony incomplete. After recounting the facts that were not in dispute (to wit, those described in Part I.A. of this opinion), the court requested written opinions from the experts on the following questions:
 
 
 38
 (1) If one assumes that the facts are only those on which the parties agree, did plaintiff exhibit "conduct demonstrating that [she was] a danger to herself," as that phrase is understood in the medical community?(2) If a physician were to conclude, on the basis of only those facts on which the parties agree, that plaintiff exhibited "conduct demonstrating that [she was] a danger to herself," would that physician's conclusion constitute a substantial departure from professional judgment?
 
 
 39
 District Court Order dated July 13, 1994 ("July 1994 Order"), at 2-3 (brackets in original).
 
 
 40
 In response to these questions, Dr. Allen submitted his affidavit stating that, in light of the facts that were undisputed, "plaintiff clearly exhibited conduct demonstrating that she was a danger to herself as understood in the medical community." (Affidavit of Michael Allen, M.D., dated July 28, 1994, p 6.) Stating that, in formulating his answers to the court's questions, he had consulted with other psychiatrists at Bellevue, Dr. Allen concluded that the involuntary commitment of Rodriguez was reasonable and consistent with professional standards:
 
 
 41
 16. It is my expert opinion that based on the undisputed facts alone, many psychiatrists would admit the patient for hospitalization or would retain the patient for further observation and information gathering.
 
 
 42
 17. Certainly, it would be below professional medical standards to simply release such a patient. At the very least, a psychiatrist would be expected to obtain more information, and an emergency admission for observation is one method of obtaining such information.
 
 
 43
 18. Whether such a patient would be admitted involuntarily on an emergency basis as a danger to herself would be a matter of clinical judgment. It would certainly not be substantially below accepted medical standards to admit the patient on a short-term basis until more information is available and the patient's response to treatment is observed.
 
 
 44
 ....
 
 
 45
 22. In sum, taking only the undisputed facts, it is my expert opinion that involuntary emergency admission was the best response, and possibly the only professional alternative, available on May 25, 1991. Plaintiff at that time presented conduct which indicated that she was a danger to herself. This conclusion was well within the standards of professional judgment and certainly cannot be considered a departure, let alone a substantial departure, from these standards.
 
 
 46
 (Id. pp 16-18, 22.)
 
 
 47
 Dr. Stastny submitted his affidavit dated July 28, 1994, in response to the court's questions ("Second Stastny Aff."), analyzing the medical significance of the undisputed facts taken separately and collectively, and concluded that none of the undisputed facts constituted conduct indicating that Rodriguez was a danger to herself:
 
 
 48
 Conduct "demonstrating that a person poses a danger to herself" as the medical community understands and applies this term means motor behavior that places the person directly at risk of harming herself. Conduct must be distinguished from considerations that are not manifestations of motor behavior but which may be relevant in assessing an individual's dangerousness. None of the undisputed facts, taken separately or in combination with each other, fit within the definition of "conduct demonstrating harm to oneself" because none of the undisputed facts placed the plaintiff at direct risk of harming herself.
 
 
 49
 (Second Stastny Aff. at 1-2.) Dr. Stastny concluded that "most of the undisputed facts simply did not amount to conduct" (id. at 2), and none of them indicated suicidality (id. at 11). He stated that "a clinician would have had to gather additional information necessary for a determination that the patient posed a danger to herself," and that without such additional information gathering, a physician's finding that Rodriguez had engaged in conduct demonstrating that she was a danger to herself "constituted a substantial departure from professional judgment." (Second Stastny Aff. at 10-11.) Dr. Stastny stated that
 
 
 50
 [f]irst, no reasonable physician could have concluded that any of the undisputed behavior placed the plaintiff at direct risk of harm. Second, any physician would not have exercised professional judgment, or adhered to minimum professional standard[s] if he relied upon only the undisputed facts to conclude that the patient posed a danger to herself.
 
 
 51
 (Id. at 11.)
 
 
 52
 Following receipt of these submissions, the district court, in a Memorandum Opinion and Order dated August 24, 1994, and reported at 861 F.Supp. 1173, granted defendants' motion for summary judgment dismissing the due process claims asserted in Rodriguez's first, second, and fifth causes of action, "hold[ing] that defendants' actions complied with MHL Sec. 9.39 as a matter of law, and thereby satisfied the demands of both substantive and procedural due process." 861 F.Supp. at 1179. In interpreting Sec. 9.39, the court stated that
 
 
 53
 the statutory bases for the finding of dangerousness are not entirely independent of medical judgment; determining whether an individual has made a "threat of suicide," or whether conduct that is manifested by the individual "demonstrat[es] that he is a danger to himself" requires a physician to make a medical decision, guided by standards that are generally accepted within the medical community.
 
 
 54
 861 F.Supp. at 1181. Without deciding whether or not Rodriguez had made a "threat of suicide" within the meaning of the statute, the court held that she had at least "exhibited 'conduct demonstrating that [she was] a danger to herself' within the meaning of the statute." Id. at 1180. In interpreting the term "conduct," the court rejected Dr. Stastny's view in favor of that of Dr. Allen and
 
 
 55
 conclude[d] that the term "conduct demonstrating that a person is dangerous to herself" as it is used in MHL Sec. 9.39 incorporates a wide range of behavior, both physical and emotional, that is objectively manifested or reported to an admitting physician, including the following: an attempt to obtain something that can be used to commit suicide; a failure to eat or sleep; crying; depressed mood; anxiety; and failure to concentrate. See Rubenstein [v. Benedictine Hospital, 790 F.Supp. 396, 409-11 (N.D.N.Y.1992) ]; dePoel [v. City of New York, 772 F.Supp. 106, 107-08 (E.D.N.Y.1991).] A physician comports with MHL Sec. 9.39 if he or she makes a finding of "substantial risk of harm to self or others" based on such conduct, interpreted in light of the context in which it is exhibited and the background information available to the physician.
 
 861 F.Supp. at 1183. The court stated that
 
 56
 plaintiff's narrow definition [of "conduct"] runs counter to the language and purpose of the statute. The phrase "other conduct demonstrating that a person is dangerous to herself" implicitly defers to medical judgment by requiring the admitting physician to interpret whether conduct exhibited by an individual poses a significant risk of harm to self or others. To be sure, this interpretation must be based on something that falls into the category of "conduct." Within this limit, however, "conduct demonstrating that a person is a danger to herself" must be interpreted in a way that enables an examining physician to make the determination of dangerousness required by the statute.
 
 
 57
 Although the parties' experts disagreed on the meaning of the statutory language, they agreed that an assessment of dangerousness requires consideration of a variety of factors, including the individual's bearing during a mental status exam, reported state of mind, symptoms of mental illness, suicidal thoughts, plans or attempts, social stressors, psychiatric history, and family history. In light of this agreement, and in light of undisputed testimony as to the lack of correlation between overt acts suggesting immediate danger and completed suicides, I conclude that to adopt plaintiff's definition of "conduct" would foreclose a physician from considering factors that, in some contexts, demonstrate that an individual poses a very high risk of suicide, despite the lack of a "recent, overt act" suggesting imminent danger. That is, to adopt plaintiff's interpretation of "conduct" would be to interpret MHL Sec. 9.39 in a way that prevents an admitting physician from accurately making the very assessment of dangerousness that the statute requires. I do not believe that this is what the New York legislature intended. See Rubenstein v. Benedictine Hospital, 790 F.Supp. 396, 411 (N.D.N.Y.1992) (requirement of Sec. 9.39 satisfied where plaintiff was diagnosed with paranoid schizophrenia and nurse told admitting physician that plaintiff was "unable to sleep, confused and paranoid, reading and underlining the Bible, reading books on Hitler and women murderers, bizarrely dressed, hyperactive, swearing and denying any problems."); dePoel v. City of New York, 772 F.Supp. 106, 107-08 (E.D.N.Y.1991) (finding of dangerousness properly made under Sec. 9.39 where one doctor's notes stated that plaintiff was "disorganized, unkempt, grossly delusional, paranoid, unable to take care of herself or house," and second doctor's notes stated "yes" to printed question, "does patient show a tendency to injure himself?").
 
 
 58
 861 F.Supp. at 1182-83 (footnote omitted).
 
 
 59
 In dealing with the record in the present case, the district court stated that many of Rodriguez's disagreements with defendants were disagreements as to emphasis "rather than outright denials," and that in light of the statements Rodriguez admitted she made, her other alleged statements could properly be disregarded in assessing whether her conduct demonstrated that she was a danger to herself. Id. at 1184. The court concluded that
 
 
 60
 even taking all plaintiff's allegations as true and resolving all ambiguities in plaintiff's favor, a reasonable jury must conclude that defendants made a finding of a "substantial risk of harm" to plaintiff based on "conduct demonstrating that she was dangerous to herself," and thus that defendants complied with the statute.
 
 Id. at 1183. The court stated that
 
 61
 the statute does not require that a physician's assessment of the likelihood of serious harm be correct; it requires only that the assessment be made on the basis of criteria that are specified in the statute. Defendants meet this standard here. I therefore grant defendants' motion for summary judgment as to plaintiff's first and second claims, and deny plaintiff's motion for partial summary judgment as to her first claim.
 
 
 62
 Id. at 1184. The court also concluded that, on the same basis, Drs. Sweeney and Lee would be entitled to qualified immunity with respect to Rodriguez's due process claims.
 
 
 63
 Finally, having found that the commitment of Rodriguez was consistent with her constitutional rights, the court also denied Rodriguez's cross-motion for summary judgment on her claim for a declaratory judgment that she is not liable to HHC for the cost of her confinement at Bellevue and dismissed that claim as well. See id. at 1187.
 
 
 64
 Judgment was entered pursuant to Fed.R.Civ.P. 54(b) dismissing the first, second, fifth, and seventh causes of action, and this appeal followed.
 
 II. DISCUSSION
 
 65
 On appeal, Rodriguez contends principally that summary judgment dismissing her due process claims was improper because (1) the question of whether or not she was properly found by the defendant doctors to pose a danger to herself was one of fact for the jury, and (2) Drs. Sweeney and Lee were not entitled to qualified immunity because (a) there was a genuine issue as to whether their conduct was objectively reasonable, and (b) in any event, qualified immunity does not protect defendants from liability on Rodriguez's claim for equitable relief. She also contends that she was entitled to summary judgment in her favor on her claim that the requirements of Sec. 9.39 were not met because Drs. Sweeney and Lee indisputably failed to find that Rodriguez had made threats of or attempts at suicide or serious bodily harm, or that she had performed acts demonstrating that she was dangerous to herself. Though we reject Rodriguez's contention that she was entitled to summary judgment in her favor, we conclude, for the reasons that follow, that summary judgment dismissing her claims was inappropriate and that the matter must be remanded for trial.
 
 A. Summary Judgment Principles
 
 66
 The pertinent principles governing the role of the court on a motion for summary judgment are well established. The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); Balderman v. United States Veterans Administration, 870 F.2d 57, 60 (2d Cir.1989); Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir.1989). If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. See, e.g., Brady v. Town of Colchester, 863 F.2d 205, 210-11 (2d Cir.1988).
 
 
 67
 On a summary judgment motion, the court is not to weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S.Ct. at 2513; United States v. Rem, 38 F.3d 634, 644 (2d Cir.1994); Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 58 (2d Cir.1987); Gallo v. Prudential Residential Services, Limited Partnership, 22 F.3d 1219, 1223-24 (2d Cir.1994). The drawing of inferences and the assessment of the credibility of the witnesses remain within the province of the finders of fact.
 
 
 68
 In reviewing a grant of summary judgment, we are governed by the same principles. We examine the record de novo, and we are required to view the evidence in the light most favorable to the party opposing summary judgment. See, e.g., Healy v. Rich Products Corp., 981 F.2d 68, 72 (2d Cir.1992); Goetz v. Crosson, 967 F.2d 29, 33 (2d Cir.1992), cert. denied, --- U.S. ----, 116 S.Ct. 80, 133 L.Ed.2d 39 (1995); Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).
 
 
 69
 In the present case, we conclude that the district court erred by (a) deciding as a matter of law an issue that was a question of fact for the jury, and (b) failing to draw all available inferences in favor of Rodriguez as the party opposing summary judgment. These errors affected the court's decision both as to the merits and as to qualified immunity.
 
 B. Due Process and Involuntary Commitment
 
 70
 An involuntary civil commitment is a "massive curtailment of liberty," Vitek v. Jones, 445 U.S. 480, 491, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980) (internal quotation marks omitted), and it therefore cannot permissibly be accomplished without due process of law, see id. at 492, 100 S.Ct. at 1263; O'Connor v. Donaldson, 422 U.S. 563, 580, 95 S.Ct. 2486, 2496, 45 L.Ed.2d 396 (1975) (Burger, C.J., concurring); Project Release v. Prevost, 722 F.2d 960, 971 (2d Cir.1983) ("Project Release "). As a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others:
 
 
 71
 [a]ssuming that th[e] term ["mental illness"] can be given a reasonably precise content and that the "mentally ill" can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.
 
 
 72
 O'Connor v. Donaldson, 422 U.S. at 575, 95 S.Ct. at 2493 (unanimous opinion); see also Vitek v. Jones, 445 U.S. at 491-94, 100 S.Ct. at 1263-64 (a prisoner, whose liberty is already curtailed, may not be transferred to a mental institution for treatment of a mental disease or defect without procedural due process); Foucha v. Louisiana, 504 U.S. 71, 79, 112 S.Ct. 1780, 1785, 118 L.Ed.2d 437 (1992) (substantive "[d]ue process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed."). "Erroneous commitments, of course, implicate the individual's interest in liberty," Goetz v. Crosson, 967 F.2d at 33, and as a procedural matter, due process does not permit continuation of a challenged involuntary civil commitment without a hearing, at which the substantive predicates must be established by clear and convincing evidence, see Addington v. Texas, 441 U.S. 418, 423-31, 99 S.Ct. 1804, 1807-12, 60 L.Ed.2d 323 (1979); see also Goetz v. Crosson, 967 F.2d at 31 (same); Warren v. Harvey, 632 F.2d 925, 930 (2d Cir.) (same), cert. denied, 449 U.S. 902, 101 S.Ct. 273, 66 L.Ed.2d 133 (1980).
 
 
 73
 Though we agree with the district court that due process does not require a guarantee that a physician's assessment of the likelihood of serious harm be correct, and we do not suggest that the clear-and-convincing standard of proof applies to a decision whether or not to order commitment in an emergency, due process does demand that the decision to order an involuntary emergency commitment be made in accordance with a standard that promises some reasonable degree of accuracy.
 
 1. The Standards Under Sec. 9.39
 
 74
 New York's overall statutory scheme governing involuntary commitments has been held facially sufficient to meet the requirements of due process. See Project Release, 722 F.2d at 972-74 (construing MHL Secs. 9.27, 9.37, 9.39 (McKinney 1978)). The plaintiffs there contended that the statutory scheme was facially invalid because it permitted involuntary commitments without requiring that dangerousness to oneself or others be manifested by a recent overt act. Section 9.39 itself was not directly challenged either facially or as applied, see Project Release, 722 F.2d at 972, and our focus was principally on the statutory scheme as a whole. Noting the "uncertainties of psychiatric diagnosis and therapy," id. at 973 (internal quotation marks omitted), and the hot debate over both "the medical profession's ability to predict dangerousness, and the role of overt acts bearing on" dangerousness, id., we concluded that
 
 
 75
 the New York State civil commitment scheme, considered as a whole and as interpreted in Scopes [v. Shah, 59 A.D.2d 203, 205-06, 398 N.Y.S.2d 911, 913 (3d Dep't 1977) ] to include a showing of dangerousness, meets minimum due process standards without the addition of an overt act requirement. We believe that further inquiry concerning the extent to which such a requirement might decrease the chance of error in predicting dangerousness may be better explored in the legislative forum.
 
 
 76
 Project Release, 722 F.2d at 973-74.
 
 
 77
 In thus declining to find the statutory scheme as a whole facially invalid in the absence of an overt-act requirement, we did not purport to hold that due process would never impose an overt-act requirement with respect to any particular section of the statute as applied. And the ruling that an overt-act requirement is not essential to the overall scheme's facial validity did not purport to answer the question of what indicia of dangerousness may be required before Sec. 9.39 can properly be applied to order an involuntary emergency commitment. Accordingly, we turn to the question of what Sec. 9.39 requires.
 
 
 78
 Section 9.39 provides that an individual is to be admitted involuntarily pursuant to that section "only if a staff physician of the hospital upon examination of such person finds that such person qualifies under the requirements of this section." MHL Sec. 9.39(a). Section 9.39 requires not only that the individual be "alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate," but also, consistent with substantive due process, that the patient's alleged mental illness be "likely to result in serious harm to himself or others." MHL Sec. 9.39(a). To the extent pertinent here, "likely to result in serious harm to himself," as used in Sec. 9.39, means posing a
 
 
 79
 substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself.
 
 
 80
 MHL Sec. 9.39(a).
 
 
 81
 The district court correctly interpreted Sec. 9.39 as "implicitly defer[ring] to medical judgment," 861 F.Supp. at 1182, and it correctly construed that section as "requir[ing] a physician to make a medical decision, guided by standards that are generally accepted within the medical community," id. at 1181. Implicit in Sec. 9.39's requirement that the decision be made by a physician is the premise that the decision will be made in accordance with the standards of the medical profession. Though committing physicians are not expected to be omniscient, the statute implicitly requires that their judgment--affecting whether an individual is to be summarily deprived of her liberty--be exercised on the basis of substantive and procedural criteria that are not substantially below the standards generally accepted in the medical community. Due process requires no less.
 
 
 82
 We are constrained to note that at least one aspect of the district court's opinion appears to depart from these principles. For example, the opinion states that "defendants made a finding of a 'substantial risk of harm' to plaintiff based on 'conduct demonstrating that she was dangerous to herself,' and thus ... defendants complied with the statute," 861 F.Supp. at 1183 (emphasis added). To the extent that this passage may be interpreted as suggesting that a physician's mere making of a finding satisfies the requirements of either the statute or due process, we reject that suggestion.
 
 
 83
 The principal difficulty we have with the "standards" part of the district court's decision is that it decided what those standards were as a matter of law. The interpretation of Sec. 9.39 itself is of course a question of law for the court; and the court correctly interpreted that section to incorporate the medical community's generally accepted standards as a matter of law. But the question of what the generally accepted standards were is a question of fact. See generally Newmann v. United States, 938 F.2d 1258, 1261-62 (11th Cir.1991) (under state medical malpractice law, conflicting expert testimony regarding what is the customary and acceptable medical standard creates an issue of fact that must be resolved by the trier of fact); Sitts v. United States, 811 F.2d 736, 739-40 (2d Cir.1987); Hutchinson v. United States, 838 F.2d 390, 392-93 (9th Cir.1988); Vidrine v. Enger, 752 F.2d 107, 110 (5th Cir.1984).
 
 
 84
 As to what, in fact, the generally accepted standards were, the evidence in the present case was sharply conflicting. For example, Dr. Stastny's testimony was that under the generally accepted professional standards, the undisputed facts in the present case constituted an insufficient body of information on which to rely in committing a person involuntarily on the ground that she was a danger to herself. Dr. Allen's testimony was that the generally accepted standards permitted involuntary commitment based on the undisputed facts alone. In choosing to credit Dr. Allen's view over that of Dr. Stastny, the district court proceeded to resolve the factual issue as to the content of the generally accepted standards of the medical community. A jury trial having been demanded, the question of which doctor's testimony is to be credited on that fact question is within the province of the jury, and it cannot be said that no reasonable jury could decline to credit the testimony of Dr. Allen over that of Dr. Stastny. The jury would be entitled to take into account, for example, the fact that Dr. Allen was the director of the psychiatric emergency program at Bellevue, the very hospital at which Rodriguez was involuntarily confined, and the jury could reasonably find that his assessment that his colleagues Drs. Sweeney and Lee had acted properly was an opinion that was not entirely objective. Again, though Dr. Allen's affidavit stated that he had consulted with other psychiatrists who concurred with his professional opinion, the jury could take note that those identified by Dr. Allen were also Bellevue colleagues.
 
 
 85
 Even absent any question as to objectivity, it would be entirely within the province of the jury to choose to give less credit to Dr. Allen's opinion than to that of Dr. Stastny. A rational jury could, for example, reject the proposition that it is consistent with the generally accepted standards of the medical profession to order an emergency involuntary commitment (a) on the basis of "vague ideation," as Dr. Allen testified, and (b) to do so when the there was "[n]o clear suicidal plan at present," as Dr. Sweeney's notes stated of Rodriguez. The jury could accept instead Dr. Stastny's testimony that the generally accepted view of the medical community was that ideation without any manifestation of intent is not sufficient to pose a danger warranting emergency involuntary commitment, and it could accept his conclusion that in the present case the ordering of such a commitment in reliance solely on the undisputed facts was performance well below the generally accepted standards of the medical community.
 
 
 86
 In sum, it was beyond the province of the court on a motion for summary judgment to decide between the experts' competing testimony on the question of what were the generally accepted standards in the medical community as to the circumstances that warrant a physician's order of emergency involuntary commitment.
 
 2. The Defendant Doctors' Performance
 
 87
 Even assuming there were no question as to the content of the pertinent professional standards--e.g., if the standards were indisputably those to which Dr. Allen testified--there are material questions as to whether the performance of the defendant doctors fell substantially below those standards. For example, Dr. Allen testified (consistently with Dr. Stastny) that though all threats are ideation, "ideation is a larger concept than threat." Dr. Sweeney apparently saw no distinction between the two concepts. She testified in her deposition that "[a]ll suicidal ideation is a threat to harm oneself," and that any attempt to distinguish between ideation and threats "is a matter of semantics." It is perhaps also noteworthy that when Dr. Sweeney was asked whether it was her understanding that in order to commit an individual pursuant to Sec. 9.39 the individual must have a mental illness, she responded, "I am not sure." We conclude that a jury could reasonably find that Dr. Sweeney's performance fell well short of the medical community's generally accepted standards even as posited by Dr. Allen.
 
 
 88
 Finally, even if there were no factual issues as to the generally accepted professional standards or the level of Dr. Sweeney's understanding of the guiding concepts, there were two categories of material questions as to the factual basis on which the defendant doctors made their decision, i.e., questions of context and occurrence. First, though the district court stated that the physician should look at the context of the patient's "conduct," see, e.g., 861 F.Supp. at 1183 (conduct should be "interpreted in light of the context in which it is exhibited and the background information available to the physician"), and Dr. Sweeney expressed a similar view, there were numerous statements in the notes on which Drs. Sweeney and Lee relied without mentioning other statements that Rodriguez's affidavit states she made. With the record viewed in the light most favorable to Rodriguez, the unrecorded statements cast the recorded information in a light that was nonthreatening. The district court perhaps set off down the wrong path when it asked the parties' experts to render opinions based solely on the core of facts as to which there was no dispute. The focus of the court in ruling on a motion for summary judgment cannot be so narrow when there exist disputes as to related facts that would permit competing inferences to be drawn as to the meanings of the undisputed events.
 
 
 89
 Second, if the assertions in Rodriguez's affidavit opposing summary judgment are true, as the court is required to assume in assessing such a motion, there were several pertinent statements that appear in the defendant doctors' notes, to which Drs. Sweeney and Lee apparently accorded considerable significance, that Rodriguez did not in fact make. For example, Dr. Sweeney's notes indicated that Rodriguez said " 'nothing makes me happy'," that Rodriguez "admit[ted] to [positive] suicidal ideation" by saying that she would not care if a car hit her while she was crossing the street, and that Rodriguez said she wished she would die. But Rodriguez stated in her affidavit that she never told Dr. Sweeney she was depressed, never told Sweeney that nothing made her happy, never said she would not care if a car hit her, and never said that she wished she would die. Thus, in addition to the question as to what were the generally accepted professional standards, there are material questions as to what in fact Rodriguez said to Drs. Sweeney and Lee and whether the doctors relied on statements Rodriguez had not in fact made. Without a resolution as to the latter questions, there could be no proper determination by the factfinder as to how the doctors' conduct measured up against the professional standards. Unless the assessment of whether or not Rodriguez was dangerous to herself was made on a reasonably competent basis, the defendant doctors could not be found to have complied with either Sec. 9.39 or the requirements of due process.
 
 
 90
 Dr. Stastny, adopting as a premise that Rodriguez's assertions were true, opined that Drs. Sweeney and Lee made not only incorrect, but also objectively unreasonable and plainly incompetent, assessments that Rodriguez was dangerous to herself. Thus, there was evidence from which a reasonable factfinder could infer that the performance of the defendant doctors in concluding that Rodriguez was exhibiting positive suicidal "ideation/intent" fell well below the generally accepted standards of professional competence in the medical community. The fact that Dr. Allen's opinion was to the contrary should have led the court to identify adequacy of performance as an issue of fact for trial, not to decide that question as a matter of law.
 
 C. The Qualified Immunity Defense
 
 91
 It is well established that in a Sec. 1983 action, qualified immunity shields a defendant official sued in her individual capacity "from liability for civil damages insofar as [her] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), or, even where the rights were clearly established, if it was objectively reasonable for the official to believe that her acts did not violate those rights, see Anderson v. Creighton, 483 U.S. 635, 638-39, 107 S.Ct. 3034, 3038-39, 97 L.Ed.2d 523 (1987); Robison v. Via, 821 F.2d 913, 920-21 (2d Cir.1987). The district court in the present case concluded that even if Drs. Sweeney and Lee were not entitled to dismissal on the ground that there was no due process violation, they would be entitled to summary judgment on the ground of qualified immunity because the generally accepted standards did not require their assessment of Rodriguez's mental condition to be correct. We have two difficulties with this conclusion.
 
 
 92
 First, though mistaken judgments reasonably arrived at are protected, qualified immunity does not protect an official against redress for performance that was plainly incompetent. See, e.g., Hunter v. Bryant, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law" (emphasis added; internal quotation marks omitted)). In some cases the plaintiff's evidence may be so weak, or the there may be so little factual dispute, as to permit the court to decide that question as a matter of law. Cf. Warren v. Dwyer, 906 F.2d 70, 76 (2d Cir.), cert. denied, 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990). In the present case, however, Rodriguez presented evidence, as discussed above, from which a reasonable jury could find that the performance of Drs. Sweeney and Lee was in fact plainly incompetent. Thus, though the defendant doctors may be entitled to qualified immunity if their performance was not plainly incompetent, their entitlement to that immunity could not properly be decided on summary judgment. In submitting the due process claims to the jury, the court has discretion to pose an interrogatory directed toward this aspect of the qualified immunity defense.
 
 
 93
 Second, the defense of qualified immunity protects only individual defendants sued in their individual capacity, not governmental entities, see generally Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991), and it protects only against claims for damages, not against claims for equitable relief, see, e.g., Allen v. Coughlin, 64 F.3d 77, 81 (2d Cir.1995); Giacalone v. Abrams, 850 F.2d 79, 84 (2d Cir.1988). As this Court has noted, an erroneous commitment may result not only in an unwarranted deprivation of liberty but also in the unwarranted "stigma of being labelled mentally ill by the state." Goetz v. Crosson, 967 F.2d at 33. Thus, whatever immunity the individual defendants might eventually be found to possess against Rodriguez's claim for damages, that immunity could not justify the dismissal of Rodriguez's claim for equitable relief in the form of the expungement of her hospital record.
 
 CONCLUSION
 
 94
 For the foregoing reasons, we conclude that summary judgment dismissing the first, second, and fifth causes of action was inappropriate. We also note that the district court's dismissal of Rodriguez's seventh cause of action, which sought a declaratory judgment that Rodriguez was not liable for the cost of care and treatment during her involuntary confinement, was premised on the court's rejection of her claims that that confinement violated her rights. Since we have concluded that summary judgment was improperly granted as to the latter claims, the dismissal of the seventh cause of action was also inappropriate.
 
 
 95
 The judgment dismissing the first, second, fifth, and seventh causes of action is vacated, and the matter is remanded for further proceedings.
 
 
 96
 Costs to plaintiff.