398 F.3d 183
 Frank OLIVIER, Plaintiff-Appellee,
v.
ROBERT L. YEAGER MENTAL HEALTH CENTER, Dr. Gerjeet Gulati, Dr. C. Rita Padilla, and Dr. Mohammed, Defendants-Appellants,
Town of Orangetown, Town of Orangetown Police Department, Charles Bullock, and Robert Manafee, Defendants.
 Docket No. 02-9494.
 United States Court of Appeals, Second Circuit.
 Argued: March 16, 2004.
 Decided: February 9, 2005.
 
 COPYRIGHT MATERIAL OMITTED Jeffrey S. Rovins, New York, NY, for Defendants-Appellants.
 Stephen Bergstein, Thornton, Bergstein & Ullrich, Chester, NY, for Plaintiff-Appellee.
 Before: SACK, SOTOMAYOR, and RAGGI, Circuit Judges.
 SACK, Circuit Judge:
 
 
 1
 The plaintiff-appellee, Frank Olivier, brought this action in the United States District Court for the Southern District of New York against, inter alia, defendants-appellants Dr. Gerjeet Gulati, Dr. C. Rita Padilla, Dr. Yar Mohammed (collectively the "defendant doctors"), and the medical facility employing these doctors, the Robert L. Yeager Mental Health Center (the "Hospital"), in Pomona, New York.[1] Olivier claims that the Hospital and the defendant doctors (collectively the "defendants") violated his Fourteenth Amendment rights by committing him to the Hospital against his will without due process of law.
 
 
 2
 The defendant doctors and Olivier's personal psychiatrist, Dr. Fraidherbe Ceus, testified as fact witnesses at trial. After the doctors had testified, the district court elected to treat them as experts because they "render[ed] opinions in the field of psychiatry." Trial Tr. at 856, Olivier v. Town of Orangetown Police Dep't (No. 01 Civ. 3823). At the close of Olivier's case, the defendants moved for judgment as a matter of law, arguing that because Olivier had introduced no expert testimony as to medical standards supporting his claim, there was "no legally sufficient evidentiary basis for a reasonable jury to find for" him. Fed.R.Civ.P. 50(a)(1). The district court (Mark D. Fox, Magistrate Judge)[2] denied the motion. The jury thereafter returned a verdict awarding compensatory and punitive damages to Olivier. The defendants then renewed their motion for judgment as a matter of law and moved for a new trial under Federal Rule of Civil Procedure 59. The district court denied both motions.
 
 BACKGROUND
 
 3
 In the mid-1990s, while Olivier was a corrections officer employed by the Rockland County, New York, Sheriff's Department, he shot a prisoner who was attempting to escape. The memory of that event haunted him.
 
 
 4
 On the morning of February 6, 2001, Olivier wrote and delivered a two-page handwritten note to his fiancee, Ann Marie Mickle. In the note, Olivier related the continuing psychological effects of the shooting incident, his depression, and his frustration with respect to and anger towards the sheriff's department for its handling of the incident. He also expressed fear that certain persons at the sheriff's department might try to kill him. But Olivier assured Mickle that with her support and the treatment provided by his personal psychiatrist, Dr. Ceus, Olivier would be able to overcome his depression.
 
 
 5
 Olivier's sister Margaret saw the note and feared that it indicated that Olivier was suicidal. She telephoned another of her and Olivier's sisters, Monica, to share her concern.
 
 
 6
 Later that afternoon, after having contacted the Hospital's crisis center (the "Crisis Center"), the sheriff's department, and the school Olivier was attending, Monica went to the Crisis Center. There she told defendant-appellant Dr. Mohammed, a psychiatrist, about the note and that, although she had not seen it, she feared that it indicated that Olivier was contemplating suicide. Monica testified that Mohammed told her that he could not commit Olivier on the sole basis of her description of the alleged contents of a letter that she had not seen. Thereafter, Mohammed contacted Dr. Ceus, who had been treating Olivier for depression and post-traumatic stress disorder related to the shooting incident. Although exactly what Ceus said to Mohammed is unclear, it is undisputed that Ceus did not then object to the involuntary commitment of Olivier to detention at the Hospital. Mohammed then issued a "police letter" authorizing the Orangetown police to detain Olivier and to bring him to the Crisis Center for further examination. Mohammed later testified that he issued the police letter based on his interview of Monica but denied having told her that he could not do so on the basis of her statement regarding the letter.
 
 
 7
 Later that evening, Olivier met with Dr. Ceus, who had by then obtained and made a photocopy of Olivier's note. On the basis of his reading of the note and his conversation with Olivier, Ceus concluded that Olivier was not suicidal after all. After Olivier returned home, however, three Orangetown police officers arrived and informed him that they had in their possession a signed commitment order — Dr. Mohammed's police letter — directing them to take Olivier to the Crisis Center. Olivier refused to cooperate; he resisted the officers' efforts to restrain him in order to transfer him to the Hospital. When they attempted to handcuff him, a struggle ensued, during which the officers used pepper spray in their effort to subdue him.
 
 
 8
 Shortly after 11:30 p.m. on the same day, the police officers delivered Olivier to the Crisis Center, where defendant-appellant Dr. Gulati, another psychiatrist, evaluated him. Another of Olivier's sisters, Marie, was also at the Crisis Center. According to Gulati, she told him that she was afraid that her brother was suicidal.[3] Olivier testified that Gulati told him, "I don't have any reason to keep you here." Trial Tr. at 100-01. After reviewing the notes of Dr. Mohammed and the admitting nurse, however, Gulati committed Olivier to detention at the Hospital because, Gulati concluded, Olivier "posed a substantial risk of physical harm to himself." Trial Tr. at 364-65.
 
 
 9
 The next day, February 7, 2001, defendant-appellant Dr. Padilla, yet another psychiatrist, examined Olivier for some forty-five minutes. She then phoned Dr. Ceus, who recommended that Olivier be released. Padilla declined to authorize Olivier's release, however, because she thought it unsafe to do so. Although she did not then think him suicidal, she was under the impression that he had refused to "contract for safety," i.e., promise not to hurt himself or anyone else.
 
 
 10
 On the following day, February 8, 2001, Dr. Padilla again examined Olivier. Because he was calmer than he had been the day before and was now willing to "contract for safety," she authorized his release.
 
 
 11
 On May 4, 2001, Olivier brought this action in the United States District Court for the Southern District of New York under 42 U.S.C. § 1983, alleging that the defendants, by committing him to involuntary detention, violated his right to due process under the Fourteenth Amendment to the United States Constitution. Drs. Ceus, Mohammed, Gulati, and Padilla all testified as fact witnesses at trial. None had been identified before trial as a potential expert witness or was formally qualified as an expert at the time of his or her testimony. During the charging conference, the district court indicated that it would instruct the jury that the four doctors testified as expert witnesses. Trial Tr. at 856. Olivier's attorney stated that "it wasn't my understanding that any of these three people [the defendant doctors] were expert witnesses" and asked whether the court thought the instruction was necessary. Id. The court explained that it would charge the jury that the defendant doctors and Dr. Ceus had testified as experts because they "render [ed] opinions in the field of psychiatry." Id. Magistrate Judge Fox stated that he thought that the charge was necessary "only, again, because I think the jury needs to know that simply because a physician gives an opinion doesn't mean that the jury is bound to accept that opinion." Id.
 
 
 12
 At the close of Olivier's case, the defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), arguing that because Olivier had introduced no expert testimony indicating that the defendant doctors had deviated from accepted medical practice, there was "no legally sufficient evidentiary basis for a reasonable jury to find" that the defendant doctors improperly committed Olivier. Fed.R.Civ.P. 50(a). The district court denied the motion.
 
 
 13
 On July 19, 2002, the jury returned a verdict awarding Olivier $5,000 in compensatory damages and $50 in punitive damages against each of the defendant doctors, and $15,000 in compensatory damages against the Hospital. Thereafter, the defendants renewed their motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). They also moved for a new trial under Federal Rule of Civil Procedure 59, arguing, inter alia, that the district court had improperly declined to instruct the jury that in order to find that the defendants denied Olivier due process, the jury was required to find that the defendants' actions with respect to Olivier's commitment departed from generally accepted medical practice. The district court denied both motions.
 
 
 14
 The defendants appeal.
 
 DISCUSSION
 I. Motion for Judgment as a Matter of Law
 
 A. Standard of Review
 
 
 15
 We review de novo the district court's denial of a motion for judgment as a matter of law. Cobb v. Pozzi, 363 F.3d 89, 101 (2d Cir.2004). Such a motion may be granted as to an issue only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-movant] on that issue." Fed.R.Civ.P. 50(a)(1).
 
 
 16
 
 B. Due Process, Involuntary Committal, and Expert Witnesses
 
 
 
 17
 New York Mental Hygiene Law § 9.39 provides for the temporary involuntary commitment of persons to mental health facilities.
 
 
 18
 The director of any hospital maintaining adequate staff and facilities for the observation, examination, care, and treatment of persons alleged to be mentally ill ... may receive and retain therein as a patient for a period of fifteen days any person alleged to have a mental illness ... which is likely to result in serious harm to himself or others.
 
 
 19
 N.Y. Mental Hyg. Law § 9.39(a). We have held that section 9.39 facially satisfies Fourteenth Amendment due process requirements. Project Release v. Prevost, 722 F.2d 960, 972-74 (2d Cir.1983).
 
 
 20
 In Rodriguez v. City of New York, 72 F.3d 1051 (2d Cir.1995), we set forth in some detail the inquiry courts must undertake to determine whether a particular involuntary commitment under section 9.39 meets due process standards.
 
 
 21
 An involuntary civil commitment is a "massive curtailment of liberty," and it therefore cannot permissibly be accomplished without due process of law. As a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others:
 
 
 22
 [a]ssuming that th[e] term ["mental illness"] can be given a reasonably precise content and that the "mentally ill" can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.
 
 
 23
 ... [D]ue process does not require a guarantee that a physician's assessment of the likelihood of serious harm be correct, and we do not suggest that the clear-and-convincing standard of proof [applicable to long-term involuntary commitment] applies to a decision whether or not to order commitment in an emergency, [but] due process does demand that the decision to order an involuntary emergency commitment be made in accordance with a standard that promises some reasonable degree of accuracy.
 
 
 24
 Id. at 1061-62 (first three alterations in original; citations omitted).
 
 
 25
 Though committing physicians are not expected to be omniscient, the statute implicitly requires that their judgment — affecting whether an individual is to be summarily deprived of her liberty — be exercised on the basis of substantive and procedural criteria that are not substantially below the standards generally accepted in the medical community. Due process requires no less.
 
 
 26
 Id. at 1063. At the same time, it should go without saying that due process must be evaluated under a standard that allows physicians to operate effectively to protect the interests of the individuals about whom they make such judgments and of the public. Cf. Youngberg v. Romeo, 457 U.S. 307, 320, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) ("In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance `the liberty of the individual' and `the demands of an organized society.'" (quoting Poe v. Ullman, 367 U.S. 497, 542, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting))).
 
 
 27
 We note at the outset that we appear never to have expressly addressed whether a physician's improper motive or intent in committing a person to a mental institution may give rise to a violation of the due process rights of that person even though, objectively, the commitment met "standards generally accepted in the medical community." While in a situation that appears to be closely analogous to the present one, involving challenges under the Fourth Amendment to a person's seizure, we apply what appears to be a strictly objective standard, see Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."), it is not entirely clear that such a purely objective test applies here, see Savino v. City of New York, 331 F.3d 63, 76 (2d Cir.2003) (assuming that a New York abuse of process claim can support a due process claim under 42 U.S.C. § 1983,[4] the plaintiff must demonstrate, inter alia, both an intent to do harm and an improper collateral objective); Rodriguez, 72 F.3d at 1063 (noting that section 9.39 requires a physician to make a medical decision, thereby suggesting that a physician who purports to issue a committal order based on medical concerns but in fact does so for other reasons has violated due process principles); see also McArdle v. Tronetti, 961 F.2d 1083, 1088 (3d Cir.1992) (noting that a claim of improper involuntary commitment against a state actor may be brought as a claim of malicious abuse of process or malicious prosecution). But this is not an issue that we need decide today. Even if intent were relevant[5] and properly before the jury, Olivier failed to establish wrongful intent on the part of the defendants.
 
 
 28
 Turning first to the objective analysis, we note that a jury composed of non-experts typically cannot discern generally accepted medical standards for itself. In order to demonstrate an objective violation of those standards, therefore, a plaintiff ordinarily must introduce expert testimony to establish the relevant medical standards that were allegedly violated. See Sitts v. United States, 811 F.2d 736, 739-40 (2d Cir.1987).[6] "The requirement that the plaintiff introduce expert medical testimony is imposed in part because `without expert assistance a jury will often have no understanding of what constitutes reasonable behavior in a complex and technical profession such as medicine.'" Id. at 740 (quoting Paul v. Boschenstein, 105 A.D.2d 248, 249, 482 N.Y.S.2d 870, 872 (2d Dep't 1984)); see also Soc'y for Good Will to Retarded Children, Inc. v. Cuomo, 902 F.2d 1085, 1090 (2d Cir.1990) (instructing the district court, on remand, to use expert testimony to determine whether there was a "substantial departure" from accepted professional practice).
 
 
 29
 To be sure, there are rare cases in which expert testimony, therefore, may nonetheless be unnecessary for a factfinder to determine that a physician violated a standard of proper care. We have said in connection with a Federal Tort Claims Act action, for example, that "a deviation from a proper standard of care may be so clear and obvious that it will be within the understanding of the ordinary layman without the need for expert testimony." Sitts, 811 F.2d at 740; see also id. ("[W]here a dentist has pulled the wrong tooth or where an unexplained injury has occurred to a part of the body remote from the site of the surgery, expert testimony is not needed" to establish a departure from accepted medical standards. (citations omitted)). Even though expert testimony may be unnecessary in some cases, therefore, the operative question remains the same: whether the action complained of met medical standards.
 
 
 30
 A doctor's decision to commit a person involuntarily under section 9.39 does not ordinarily involve matters "within the layman's realm of knowledge," id. Determining the presence of mental illness and the potential effects thereof are "to a large extent based on medical `impressions' drawn from subjective analysis and filtered through the experience of the diagnostician." Addington v. Texas, 441 U.S. 418, 430, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). Even with such expert assistance, "[t]he subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations." Id. Consequently, "[w]hether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the meaning of the facts which [typically] must be interpreted by expert psychiatrists and psychologists." Id. at 429 (emphasis in original). We conclude, based on the record before us, that the jury was not competent to evaluate the professional propriety of the defendant doctors' actions without the assistance of expert testimony.[7] Because Olivier did not introduce expert testimony as to medical standards, "there [was] no legally sufficient evidentiary basis for a reasonable jury to find for" Olivier, Fed.R.Civ.P. 50(a)(1), on a claim that his involuntary commitment did not meet "standards generally accepted in the medical community," Rodriguez, 72 F.3d at 1063.[8]
 
 
 31
 With regard to the "subjective" inquiry, Olivier contends that because the defendant doctors "violated their own standards," Appellee's Br. at 25, they must have committed him for improper reasons. Olivier notes that his sister Monica testified that before issuing the police letter, Dr. Mohammed told her that he could not commit Olivier on the basis of her description of the alleged contents of a letter that she had not seen. Olivier also contends that Dr. Gulati told him, "I don't have any reason to keep you here." It is, however, entirely speculative to leap from this evidence to a conclusion that Olivier was committed for reasons other than the defendant doctors' conclusion that he posed an imminent danger to himself or others. Olivier has offered no suggestion as to what such other reasons might have been. We conclude that Olivier did not elicit evidence sufficient to establish to the satisfaction of a reasonable jury that the defendant doctors acted for non-medical or otherwise improper reasons in having him temporarily committed. We therefore need not and do not decide what the implications for the due process analysis might be if he had.[9]
 
 
 C. Claim Against the Hospital
 
 
 32
 Olivier asserts that the Hospital was liable for the actions of the defendant doctors because the Hospital "adopted practices which permitted the reckless disregard of [Olivier's] constitutional... rights." Compl. ¶ 50; see also Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir.2000) (stating that a municipal employer may be responsible for the actions "taken or caused by an official whose actions represent [the employer's] official policy"). Because we conclude that Olivier failed to establish that the defendant doctors violated his rights, the Hospital cannot be held derivatively liable for any such violation. The district court therefore erred in denying the Hospital's motion for judgment as a matter of law.
 
 II. Jury Instructions
 
 33
 Because our reversal of the district court's denial of the defendants' motion for judgment as a matter of law resolves this appeal, we need not and do not address their assertion that the district court improperly instructed the jury.
 
 CONCLUSION
 
 34
 For the foregoing reasons, we reverse the district court's denial of the defendants' motion for judgment as a matter of law and remand the case to the district court with instructions to grant the motion.
 
 
 
 Notes:
 
 
 [1]
 The Hospital and the defendant doctors are the sole appellants. The claims against other parties named in the complaint were dismissed at the close of Olivier's case. Olivier does not appeal from that dismissal
 
 
 [2]
 The parties consented to have Magistrate Judge Fox conduct all proceedings in this case, including the entry of final judgment, in accordance with 28 U.S.C. § 636(c)
 
 
 [3]
 It is not entirely clear that Dr. Gulati was referring to a sister Marie rather than Olivier's sister Monica, but the factual question of which family member spoke with Dr. Gulati is immaterial for these purposes
 
 
 [4]
 See Cook v. Sheldon, 41 F.3d 73, 79-80 (2d Cir.1994) (observing that it is unsettled in this Circuit whether abuse of process under state law is the basis for a section 1983 claim).
 
 
 [5]
 We need not and do not assess the possible relevance of intent to the assessment of the award of punitive damages in a section 1983 action alleging a due process violationSee Ehrlich v. Town of Glastonbury, 348 F.3d 48, 52 (2d Cir.2003) ("[The plaintiff's] punitive damages request fails because she has offered no evidence, as required in § 1983 actions, that defendant's conduct was driven `by evil motive or intent' or by `reckless or callous indifference' to the rights of others." (citation omitted)).
 
 
 [6]
 Sitts involved a claim under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, which explicitly incorporates state substantive law, see id. § 1346(b)(1), rather than a claim under section 1983. It is clear from our decision in Rodriguez, however, that in determining the evidentiary requirements for a jury's finding of a departure from generally accepted medical standards in a section 1983 case, particularly one involving involuntary commitment under section 9.39, we may look to non-section 1983 decisions that involve an alleged departure from generally accepted medical standards, such as those applying FTCA law or state medical malpractice law. Rodriguez, 72 F.3d at 1063 (citing Sitts, 811 F.2d at 739-40).
 
 
 [7]
 Olivier places great emphasis on our decision inHathaway v. Coughlin, 37 F.3d 63 (2d Cir.1994). Hathaway was a section 1983 case relating to medical care in which we held that expert testimony was unnecessary for the plaintiff to establish his claim. Id. at 68. There, the plaintiff, a New York State prisoner, brought an action against a prison doctor for failing to inform the plaintiff for a considerable period of time after he began to complain of pain in his hip, that pins that had been inserted in the hip had broken, and for failing to treat the condition. Id. at 65. The plaintiff claimed that the doctor's sustained, deliberate indifference to his medical condition constituted cruel and unusual punishment proscribed by the Eighth Amendment, as applied to the states by the Fourteenth Amendment. The question raised before the trial court was thus whether the defendant doctor had been deliberately indifferent to the plaintiff's serious medical needs. Id. at 66. The medical appropriateness of the doctor's inaction, though perhaps relevant, was not the focus of the dispute. The trier of fact thus did not require expert evidence to decide whether the doctor was indifferent and whether any such indifference was intentional.
 
 
 [8]
 The dissent stresses that the doctors were treated as experts by the district court. Indeed, after they had testified, the court determined that they had rendered medical opinions and so charged the jury. Trial Tr. at 856, 957-58. While many of the doctors testified as to the internal hospital procedures and legal standard for a patient's involuntary commitment, they did not testify as to community medical standards. The dissent argues that the question is not whether the defendant doctors applied accepted medical standards, but rather whether they applied the appropriatelegal standard. The legal standard, however, incorporates "standards generally accepted in the medical community." Rodriguez, 72 F.3d at 1063. Therefore, the jury could not properly evaluate compliance with the legal standard unless it heard expert testimony as to medical standards.
 
 
 [9]
 We note further that the district court instructed the jury that to find for Olivier, the jury must first find that Olivier was "detained for a longer period of time, if any, than was reasonably necessary under the circumstances." Trial Tr. at 965. The court continued:
 In order to determine that the defendants' acts caused the plaintiff to suffer the loss of a federal right — specifically here, an unreasonable deprivation of liberty — you must then determine whether the defendant psychiatrists acted within or without the boundaries of their lawful authority, using the reasonableness standard I just enunciated.
 Id. at 966. The charge thus framed in terms of a test of objective reasonable necessity would appear not to support a verdict on the theory that the defendant doctors failed to meet a subjective standard.
 
 
 RAGGI, Circuit Judge, dissenting:
 
 35
 In this involuntary commitment case, the court reverses a jury verdict in favor of plaintiff Olivier because it concludes that no group of laypersons could have determined that the defendant doctors violated due process without "expert testimony to establish the relevant medical standards that were allegedly violated." Supra at 190. I respectfully dissent.
 
 1. Requiring Expert Medical Testimony to Pursue a Due Process Challenge to Involuntary Commitment
 
 36
 Preliminarily, I observe that I do not understand the court today to be holding that expert testimony is an absolute prerequisite to establishing a due process challenge to involuntary commitment. See supra at 190-91. Professor Wigmore notes that the law has rarely imposed such a "rule-of-thumb," and he has wisely cautioned against its expansion. 7 Wigmore, Evidence § 2090, 579-90 (Chadbourn rev.1978).[10]
 
 
 37
 In general, the law affords trial judges considerable discretion to admit or exclude expert evidence as appropriate to helping a jury perform its sworn role. See Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962) (recognizing that "a trial judge has broad discretion in the matter of the admission or exclusion of expert evidence"). Indeed, because that determination necessarily "turns on a variety of factors readily apparent only to the trial judge," a reviewing court should sustain "his decision to permit the jury to decide the case without the aid of experts unless the decision was `manifestly erroneous.'" Morgan v. District of Columbia, 824 F.2d 1049, 1061 (D.C.Cir.1987) (quoting Salem v. United States Lines Co., 370 U.S. at 35, 82 S.Ct. 1119 (reversing appellate ruling that jury could not decide issues of unseaworthiness and negligence without expert testimony as to proper marine architecture)). For reasons discussed more fully in the remainder of this dissent, I do not think the district court committed such error in this case.
 
 2. Expert Medical Testimony Was Presented to the Jury in This Case
 
 38
 I cannot agree that no expert testimony as to medical standards was presented to the jury in this case. The district court specifically charged the jury that the defendant doctors and Dr. Ceus testified not only as witnesses to historical facts, but as experts, competent to render opinions on matters within their expertise. See Trial Tr. at 957-58. When, during the charging conference, the court stated that the doctors were "not expert witnesses within the meaning of Rule 26" of the Federal Rules of Civil Procedure, it explained that what it meant was that the witnesses had not been "retained by a party for the [singular] purpose of giving expert testimony." Id. at 856. Nevertheless, it concluded that an expert-witness instruction was warranted because the doctors "did render opinions in the field of psychiatry." Id. Given the considerable background and training all these doctors had in psychiatry, and specifically in New York's involuntary commitment procedures, I do not think we can fault the district court's recognition of them as expert witnesses. See, e.g., Nora Beverages, Inc. v. Perrier Group of America, Inc., 164 F.3d 736, 746 (2d Cir.1998) (noting that the district court has broad discretion to determine whether a proposed witness is qualified to testify as an expert, and its determination is reversible only for "manifest error.")[11]
 
 
 39
 3. Further Expert Medical Testimony Was Unnecessary for the Jury to Resolve the Parties' Dispute Regarding Defendant Doctors' Disregard for the Established Legal Standard
 
 
 40
 In ordering reversal, the majority observes that the defendant doctors, even if recognized as expert witnesses, testified only "as to the internal hospital procedures," not "to community medical standards." Supra at 191 n. 8. To my mind, this distinction is of no import because there was no factual dispute between the parties as to accepted medical standards. Rather, plaintiff sought to prove that the defendant doctors deliberately or recklessly ignored the applicable legal standard for involuntary commitment, ordering his confinement even though they did not, in fact, believe that he presented a risk of danger to himself or others.
 
 
 41
 The legal standard for involuntary commitment of the mentally ill is well established and requires no expert testimony: "due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others." Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir.1995) (and cases cited therein). Common sense dictates that due process cannot insist that danger assessments always be correct, but it does demand that involuntary commitment be ordered only "in accordance with a standard that promises some reasonable degree of accuracy." Id. at 1062. To ensure such accuracy, New York law requires that assessments of dangerousness be made by licensed physicians. Id.; see also 7 Wigmore, Evidence § 2090, 588. But a physician's finding of dangerousness cannot, by itself, satisfy due process. A physician's judgment in ordering involuntary confinement must "be exercised on the basis of substantive and procedural criteria that are not below the standards generally accepted in the medical community." Id. at 1063. In sum, in the context of involuntary commitments, due process has both a subjective and objective component. Before a mentally ill person is confined against his will, a physician must subjectively determine that he presents a risk of danger to himself or others, reaching that determination consistent with the objective standards generally accepted within the medical community.
 
 
 42
 Thus, in cases where a physician makes the necessary subjective determination of dangerousness, a plaintiff challenging that assessment for failing to comport with generally accepted medical standards may well need to present expert testimony as to those standards to raise a triable issue of fact. Cf. Rodriguez v. City of New York, 72 F.3d at 1063 (reversing summary judgment award in favor of defendants because parties' conflicting expert opinions raised a question of fact as to whether accepted medical standards viewed "suicidal ideation" without more as a sufficient indicator of dangerousness to warrant confinement). But that is not this case. Olivier did not claim that his involuntary commitment violated due process at the objective level of analysis because the defendant doctors employed the wrong medical standard in making their dangerousness determinations. He claimed that the defendant doctors violated due process at the first subjective level by consciously disregarding their legal duty to make a dangerousness assessment. In short, they recklessly ordered his confinement even though they did not actually believe from the evidence before them that he presented the requisite risk of danger. Because this due process challenge turned largely on the jury's assessment of the witnesses' credibility, its resolution required no further expert medical testimony. See generally United States v. Forrester, 60 F.3d 52, 63 (2d Cir.1995) ("As a matter of law, the credibility of witnesses is exclusively for the determination by the jury") (internal quotation marks and citation omitted); Bossett v. Walker, 41 F.3d 825, 830 (2d Cir.1994) (same); United States v. Shulman, 624 F.2d 384, 388 (2d Cir.1980) (same).[12]
 
 
 43
 4. A Review of the Evidence in the Light Most Favorable to Olivier Indicates that the Defendant Doctors Violated Due Process by Committing Him Although They Did Not Believe that He Presented the Requisite Risk of Danger
 
 
 44
 Needless to say, the issue of whether the defendant doctors did or did not believe that Olivier presented a risk of danger when they ordered him confined was hotly contested at trial, with the parties presenting conflicting versions of the facts and vigorously challenging the credibility of each side's witnesses. Had the jury resolved these conflicts in favor of defendant doctors, the record would not permit a court to second-guess that conclusion. But, on this appeal to overturn a jury verdict in favor of Olivier, we must examine the record in the light most favorable to him. In short, we must assume that the jury resolved all credibility disputes and drew all reasonable inferences in his favor. See Advance Pharm., Inc. v. United States, 391 F.3d 377, 390 (2d Cir.2004); Randall v. K-Mart Corp., 150 F.3d 210, 211 (2d Cir.1998). We may not set aside the judgment unless, upon such review, we conclude that "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." Advance Pharm., Inc. v. United States, 391 F.3d at 390 (quoting Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir.1998)); Randall v. K-Mart Corp., 150 F.3d at 211; Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1177 (2d Cir.1996).
 
 
 45
 Reviewing the record in this light, I must conclude that sufficient evidence permitted the jury to find that the doctor defendants confined Olivier on the basis of evidence they themselves believed to be insufficient to support a finding of dangerousness. The majority suggests that such a finding is insufficient to prove a due process violation because it would be "speculative to leap from this evidence to a conclusion that Olivier was committed for reasons other than the defendant doctors' conclusion that he posed an imminent danger to himself or others." Supra at 191-92. The majority also faults Olivier for "offer[ing] no suggestion as to what such other reason might have been." Id. I do not, however, understand it to be part of a plaintiff's burden in raising a due process challenge to involuntary commitment to prove that the defendants acted for non-medical or otherwise improper reasons. It might well be the medical view of some psychiatrists that confinement would benefit some mentally ill individuals who do not present an immediate risk of harm to themselves or others, but due process does not permit them to order such confinement against a person's will. Thus, if the record, viewed in the light most favorable to plaintiff, supports a jury finding that the doctor defendants — for whatever reason — ordered Olivier's commitment without believing that he presented the requisite risk of danger to himself or others, I think we must affirm the judgment in this case. Such a view of the record does support that jury finding as to each of the three defendant doctors.
 
 
 46
 a. Dr. Mohammed
 
 
 47
 On February 6, 2001, Monica Olivier went to defendant hospital's Crisis Center seeking assistance for her brother, whom she feared was suicidal. Monica Olivier there explained to Dr. Mohammed that her concerns were based on a letter that her brother had written to his girlfriend. Although she had not herself seen the letter, Monica reported that another sister, Margaret, had told her the letter stated that her brother "couldn't live in this condition anymore," and that, if "something happened to him," his children were to get certain items of property. Trial Tr. at 289. Dr. Mohammed also learned, however, that earlier that same day, at Monica's behest, officials from the local sheriff's office and the college where Olivier was then enrolled had spoken to him, that Olivier had denied any thoughts of suicide, and that the officials concluded that no intervention was necessary. Further, Dr. Mohammed learned that Olivier's girlfriend had spoken directly with Olivier after receipt of the letter in question, and she had telephonically reported to Mohammed's nurse that Olivier had no intention of killing himself. Dr. Mohammed testified that based on his conversation with Monica Olivier, he nevertheless concluded that Olivier presented a sufficient threat to himself to warrant issuance of a "police letter" for his detention.
 
 
 48
 If we were to assume that Dr. Mohammed's testimony was credited, it might have been helpful to the jury for Olivier to have presented expert testimony that, based on the evidence before him, Dr. Mohammed's assessment of Olivier's dangerousness fell below reasonable medical standards for the evaluation of mental illness.[13] In fact, however, we must assume that Dr. Mohammed's testimony with respect to his dangerousness conclusion was not credited. Monica Olivier expressly testified that Dr. Mohammed admitted to her that the facts before him were insufficient to permit him to make the dangerousness assessment necessary to support involuntary commitment:
 
 
 49
 [H]e basically said that he couldn't issue a police letter based on what I had told him, because I didn't actually see the letter. And he said maybe if my sister had talked to him, being that she was the one who had read the letter, or maybe if the girlfriend had talked to him or even showed him the letter, then he probably would have been able to issue a police letter, but he couldn't because he said that my brother had rights, and he had no jurisdiction, basically, to violate them based on what I told him.
 
 
 50
 Trial Tr. at 734.
 
 
 51
 Further, Dr. Mohammed's credibility was undermined by discrepancies between his testimony and that of Dr. Ceus regarding their telephone conversation on February 6, 2001. The majority notes that "exactly what Ceus said to Mohammed is unclear." Supra at 186-87. I would agree if this court were being asked to resolve the sharp factual conflicts between these witnesses' testimony. But that is not our task; on this appeal, we must assume that the jury resolved all credibility conflicts in favor of plaintiff's witness, Dr. Ceus. Thus, while it may be correct to note, as the majority does, that it is undisputed that Dr. Ceus did not specifically object to Olivier's involuntary commitment in his conversation with Dr. Mohammed, see supra at 186-87, we must assume the jury credited Dr. Ceus's explanation that he told Dr. Mohammed that he could not make that decision for him. Dr. Mohammed would have to reach his own conclusion. See Trial Tr. at 620-21, 624. Further, we must assume the jury found that Dr. Ceus did not "recommend[ ]" detention, as Dr. Mohammed wrote in his clinical notes, id. at 320, nor did Ceus ever "concur" in detention, as Dr. Mohammed testified at trial, id. at 325; see also id. at 620-21.
 
 
 52
 Assuming then that the jury rejected Dr. Mohammed's testimony and credited Monica Olivier's account, it could reasonably have found that Dr. Mohammed issued a police letter based on evidence that he himself admitted was insufficient to permit a physician to make the legally-required assessment of dangerousness. Under these circumstances, I cannot agree with my colleagues in the majority that further expert testimony was required to support a verdict in favor of plaintiff.
 
 
 53
 b. Dr. Gulati
 
 
 54
 Similarly, if the evidence pertaining to Dr. Gulati's detention order is viewed in the light most favorable to Olivier, we must conclude that the jury discredited his testimony that he committed Olivier based on a professional assessment that plaintiff presented a substantial risk of harm to himself. See Trial Tr. at 364-65. Instead, we must assume that the jury believed Olivier when he testified that Dr. Gulati admitted to him that he did not "have any reason to keep you here. You seem to be fine." Id. at 100-01.
 
 
 55
 Not insignificant to understanding the jury's decision is the fact that Dr. Gulati's credibility was undermined by inconsistencies between his testimony and that of a third sister, Marie Olivier, regarding their conversation pertaining to the need for detention. Although Dr. Gulati stated that Marie Olivier was afraid her brother was suicidal and "plead[ed] for keeping him overnight because she felt he was really unsafe to be released," id. at 363, Marie Olivier denied that she made such statements, id. at 779. She testified that, in fact, she implored Gulati to release her brother, telling the doctor that Olivier had seen Dr. Ceus shortly before being brought to the Crisis Center by the police and "that he was fine and there was no reason for him to be up there." Id.
 
 
 56
 Assuming, as we must, that the jury did not find Gulati to be a credible witness and, instead, accepted Olivier's account of the doctor's concession, I do not think the jury needed further expert testimony to conclude that a doctor who ordered involuntary detention without "any reason" acted in reckless disregard of a person's right to due process.
 
 3. Dr. Padilla
 
 57
 As the majority recognizes, Dr. Padilla, who examined Olivier on February 7, 2001, acknowledged that she did not think he then presented a suicidal danger to himself, see supra at 187; nevertheless, she ordered his continued involuntary detention because "he was agitated," and refused to "contract for safety," Trial Tr. at 450-51, 463. Here again, if this evidence had been uncontradicted, expert testimony might have assisted a jury to determine whether accepted medical standards indicated that agitation and a refusal to contract for safety indicated the sort of danger to self or others warranting confinement. But, as with Drs. Mohammed and Gulati, we must assume that the jury did not find Dr. Padilla credible.
 
 
 58
 Olivier himself contradicted Dr. Padilla's account, testifying that she did not ask him to contract for safety on February 7. See id. at 112-13. Rather, this request was first made in the February 8 interview immediately prior to Olivier's release, at which time he agreed to sign the proffered papers. See id. at 119-20. Assuming that Olivier did not refuse to contract for safety on February 7 and that Dr. Padilla did not believe him to be suicidal at that time, I cannot agree that a jury needed further expert testimony to conclude that involuntary commitment in these circumstances violated due process.
 
 
 59
 I note that Dr. Padilla's credibility was further impeached by Olivier's testimony that Padilla told him that she had spoken with Dr. Ceus who told her that Olivier was suicidal. See id. at 114. Dr. Padilla also made an entry in Olivier's records indicating that Dr. Ceus had told her Olivier's letter to his girlfriend indicated that he thought he would be "better off dead." Admission Note Feb. 7, 2001. Dr. Ceus testified that he never made any such statements to Dr. Padilla. See Trial Tr. at 626-27. Indeed, Olivier's letter to his girlfriend, offered in evidence, did not contain any statement akin to that noted by Dr. Padilla. See Pl. Tr. Ex. 13.
 
 
 60
 Significantly, the defense, as part of its trial strategy, urged the jury to conclude that the letter exhibit was not the original written by Olivier to his girlfriend, but a document fabricated for trial. Further, the defense insisted that Dr. Ceus, whom it attacked as a persistent liar, was complicit in the scheme to manufacture evidence. In summation, the defense drew a bright line for the jury, arguing that a verdict for Olivier required the jury to find that the defendant doctors had all lied. See Trial Tr. at 946. This was plainly a risky strategy and, apparently, it backfired. Whatever reservations we may have about the credibility conflicts in this case, for purposes of this appeal, we must assume that the jury reached precisely the conclusion suggested by the defense in returning a verdict for Olivier.
 
 
 61
 In sum, assuming that the jury rejected the testimony of the defendant doctors and credited all the evidence offered by plaintiff, especially the evidence of concessions made by each of the three doctors that they did not, in fact, believe that plaintiff presented the requisite risk of harm to himself or others at the time they signed the challenged detention orders, I do not think we can conclude that the record was insufficient to support the verdict. Accordingly, I would affirm the judgment of the district court.
 
 
 
 Notes:
 
 
 [10]
 One of the rare claims requiring expert testimony is medical malpractice. InSitts v. United States, 811 F.2d 736, 739-41 (2d Cir.1987), a case relied on by the majority, see supra at 190, we recognized New York's expert-witness requirement for malpractice actions and ruled that the requirement applied regardless of whether malpractice actions were tried to a jury or to the court. But, as we subsequently made plain in Einaugler v. Supreme Court of the State of New York, "we did so in recognition of the fact that nearly one hundred years of New York [malpractice] cases specified such a requirement. In other words, the New York courts established this rule. We did not." 109 F.3d 836, 841 (2d Cir.1997). In Einaugler, we declined to extend such an absolute expert-witness requirement to other actions in which the exercise of medical judgment was an issue. Specifically, we declined to hold that in a criminal case (where the prosecution's burden would be proof beyond a reasonable doubt rather than the lesser preponderance standard applicable to civil cases), the prosecution was required to present expert medical testimony to prove a physician's reckless endangerment of a patient's life. Thus, while generally accepted medical standards may be relevant to both malpractice and due process challenges to involuntary commitments, I would not assume that the same expert-witness requirement applies to both claims.
 Another rare circumstance identified by Professor Wigmore as requiring expert testimony is a commitment proceeding against the mentally ill or incompetent. See 7 Wigmore, Evidence § 2090, 587-90. It might well be expected that a free society would, at a minimum, demand that "on a proceeding to commit a person to restraint as mentally deranged or defective, the opinion of physicians must be adduced." Id. at 588 (emphasis in original). But it does not necessarily follow that the same society would categorically refuse to hear a person's subsequent due process challenge to that confinement without contrary expert testimony. Much would depend on the nature of the challenge.
 Thus, I would impose no rigid expert-witness requirement to due process challenges to involuntary commitment. Trial courts may well decide that expert evidence is frequently helpful to the fact-finder in such cases. But where no such evidence is received, an insufficiency argument should not automatically succeed. Rather, a court must review the totality of the evidence to determine whether a plaintiff could or, as in this case, has proved a violation of due process.
 
 
 [11]
 The majority notes, atsupra 188, that plaintiff did not provide advance notice that he intended to elicit expert opinions from these witnesses. See Fed.R.Civ.P. 26. Defendants, however, raised no notice objection in the district court, either to the witnesses' testimony or to the district court's instruction. In any event, a district court may, in its discretion, forgive a notice omission that is harmless, see Fed.R.Civ.P. 37(c), and defendant doctors can hardly complain that they were harmed by plaintiff's reliance on their own testimony as to any relevant accepted medical standards.
 
 
 [12]
 The majority suggests that the district court's charge presented the case to the jury only on a theory of objective reasonablenessSupra at 192 n. 9 The cited instruction asks the jury to consider whether Olivier was "detained for a longer period of time, if any, than was reasonably necessary under the circumstances." Trial Tr. at 965. Because the sole contested issue in this case, however, was whether any detention was warranted, a jury finding that the doctors never subjectively believed that Olivier posed a serious danger to himself or others would have supported a conclusion that his involuntary detention was not "reasonably necessary" under the established legal standard. The majority further asserts that the district court used the same objective reasonableness standard when instructing the jury to consider "whether the defendant psychiatrists acted within or without the boundaries of their lawful authority." Trial Tr. at 966. Because the doctors'"lawful authority" to order involuntary commitment required them (1) to find that a person presented a particular risk of danger and (2) to employ accepted medical standards in making that finding, a jury determination that the doctors never made the requisite finding would support a conclusion that they exceeded their legal authority without any need to consider the medical standard by which an actual finding of dangerousness would be judged.
 
 
 [13]
 There is no reason to think such expert testimony could not have been obtainedSee Rodriguez v. City of New York, 72 F.3d at 1063 (noting that a rational jury could have accepted the opinion of plaintiff's psychiatric expert "that the generally accepted view of the medical community was that [suicidal] ideation without any manifestation of intent is not sufficient to pose a danger warranting emergency involuntary commitment").